127 N.J. Super. 101 (1974)
316 A.2d 483
RICHARD J. ALBIGESE, TRADING AS DOMINION ENTERPRISES, PLAINTIFF,
v.
CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, STEFAN HAJZL, FLORENCE CAFFNEY AND EMMA SMITHERMAN, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 14, 1974.
*106 Mr. Joseph L. Freiman for plaintiffs.
Mrs. Eileen Tulipan Martini, Special Counsel, for defendants (Mr. Raymond Chasan, Corporation Counsel for the City of Jersey City, attorney).
LARNER, A.J.S.C.
This action in lieu of prerogative writs is brought by the owner of several apartment buildings in Jersey City attacking the validity of certain provisions of the Rent Stabilization Ordinance of the City of Jersey City. The matter was heard at a plenary trial with full presentation of evidence by both litigants in the controversy.
At the time of trial the court had before it the basic ordinance, Jersey City, N.J., Ordinance 346, February 20, 1973 (hereinafter cited as J. 346) and the amending ordinance, Jersey City, N.J., Ordinance 366, July 17, 1963 (hereinafter cited as J. 366). Subsequent to the hearing, the city passed a further amendatory ordinance, Jersey City, N.J., Ordinance 390, November 20, 1973 (hereinafter cited as J. 390). In view of the fact that the court is required to decide the case on the basis of the status of the law at the time of determination, Hohl v. Readington Tp., 37 N.J. 271, 279 (1962); Kligman v. Lautman, 91 N.J. Super. 488, 493 (App. Div. 1966); Noble v. Chairman, etc., Mendham Tp., 91 N.J. Super. 111, 116 (App. Div. 1966), cert. den. 48 N.J. 120 (1966), and with the acquiescence of the parties, the conclusions reached herein will be based upon the local law in effect as of this date.
*107 The power of a municipality to adopt ordinances controlling or stabilizing rents has been approved by the Supreme Court of this state in Inganamort v. Fort Lee, 62 N.J. 521 (1973). The contention that a local government is powerless to legislate in the area of rent control is therefore no longer a viable issue. Hence, the challenge to the ordinance is focused upon the absence of an emergency justifying the exercise of that power and upon the means utilized in the ordinance to accomplish the intended purpose.
The ordinance in question seeks to control rents in buildings having more than four dwelling units by stabilizing the rentals in those buildings at the levels which obtained on January 11, 1973, the date of the expiration of Phase III of the Federal Government's Economic Stabilization Program. Utilizing the January 11, 1973 base as the standard for the rent freeze, provision is made for permissible increases based upon changes in circumstances. For example, an automatic percentage increase is granted at the termination of a tenancy equal to the amount that the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor has increased over the index figure existing at the commencement of the tenancy (§ 4, as amended by J. 366). Provision is also made for a rent surcharge when warranted by increase in taxes (§ 5, as amended by J. 390), or expenditures for capital improvements (§ 10B, as amended by J. 390). In addition, there is a provision for a "hardship" increase when the "landlord cannot meet his mortgage payments and maintenance" (§ 10A, as amended by J. 390).
The ordinance by its terms is limited to a life of one year and expires at that time unless extended by resolution of the municipal council on a year-to-year basis. It delegates the administration of the ordinance to a Rent Leveling Board with appropriate provisions for hearings and notice to interested parties (§§ 10, 11, as amended by J. 390).
The manifold contentions of plaintiff may be briefly summarized as follows:
*108 1. There is no critical housing shortage in Jersey City which can legitimately support the exercise of the police power to control rents.
2. The retroactive provision of the ordinance rolling back rents to the levels in existence on January 11, 1973 is an unconstitutional impairment of the obligation of contracts.
3. The limited applicability of the ordinance to buildings containing more than four dwelling units constitutes an unreasonable classification and creates unconstitutional discrimination.
4. The use of the Consumer Price Index of the U.S. Department of Labor as a criterion for permissible rent increases is arbitrary and fails to assure the owner a fair return on his investment.
5. The method of computing a rent surcharge for tax increases is arbitrary and unreasonable.
6. The method of computing a rent surcharge for a capital improvement is arbitrary and unreasonable.
7. The provision for a hardship increase is unfair and unreasonable.

Existence of Emergency
The constitutionality of rent control regulation depends upon the existence of a housing emergency, for without such an underlying need the municipality would not be legally justified in exercising its police power in this area of control. Jamouneau v. Harner, 16 N.J. 500, 514-517 (1954). See also, Stuyvesant Town v. Ligham, 17 N.J. 473, 483 (1955). An emergency, in this sense, is an "unusual public exigency calling for the exercise of the police power to alleviate the common peril or need." Jamouneau, supra, 16 N.J. at 514.
The preamble of the ordinance recites the existence of a housing emergency due to exorbitant and speculative rent increases which are causing "severe hardships upon tenants and are adversely effecting [sic] the health, safety and general welfare of the citizens" of the community (Preamble, *109 J. 346). With or without this recital, the ordinance is presumed to be valid and to have been adopted on the factual foundation essential for its validity. Garden State Racing Ass'n v. Cherry Hill Tp., 42 N.J. 454, 464 (1964); State v. Mundet Cork Corp., 8 N.J. 359, 369-371 (1952); Johnson v. Montville Tp., 109 N.J. Super. 511, 519 (App. Div. 1970). The burden therefore rests upon plaintiff to establish the absence of the emergency asserted expressly and impliedly by the municipality.
Although some opinions in the field of landlord-tenant law make reference to the court taking judicial notice of the existence of an acute shortage of low-income housing in urban centers in this State, Samuelson v. Quinones, 119 N.J. Super. 338, 343 (App. Div. 1972); Troy Hills v. Fischler, 122 N.J. Super. 572, 582 (Law Div. 1971), aff'd 122 N.J. Super. 525 (App. Div. 1972); Tanella v. Rettagliata, 120 N.J. Super. 400, 411 (Cty. Ct. 1972); Academy Spires, Inc. v. Brown, 111 N.J. Super. 477, 480 (Cty. Ct. 1970), the imprimatur placed upon the right of municipalities to adopt local rent control ordinances in Inganamort, supra, requires a factual inquiry into the existence or nonexistence of the emergency in the affected locale.
Plaintiff sought to establish the absence of an emergency by reference to factors allegedly demonstrating an open rental market in Jersey City. One factor projected by the proofs is the increase of the number of advertisements for vacant apartments in local newspapers between 1971 and 1973, although there was no correlation between these advertisements and the rental range involved. In addition, real estate brokers, with a personal financial interest as property owners, testified in very general terms that there were more vacant apartments available in 1973 than there were in 1970 or 1971, and that the payment of broker's fees on rentals has shifted from tenants to landlords. One of the brokers estimated a vacancy factor of 5% in Hudson County based upon discussions with owners. Another owner-broker testified that he had a current vacancy factor of 16% in two buildings, *110 with a drastic increase in vacancies commencing in the beginning of 1973. Several building superintendents also testified that more vacancies existed in 1973 than in past years.
The Director of Planning of Jersey City testified as an expert and as one intimately familiar with the housing conditions in Jersey City. His department has monitored the housing situation in the city since 1961, preparing various reports on all phases of data relevant to housing, including statistical analyses of housing unit vacancies. The most recent and comprehensive report prepared under his supervision for submission to the governing body and to the appropriate federal agency was published in September 1973. It is entitled "Jersey City Housing Crisis" and is a compendium of housing information garnered from other reports, investigative field work and discussions with realtors.
The planning expert, using the 1970 census data as a starting point, concluded that as of September 1973 there was a vacancy factor of less than 3%, based on the number of units added to the rental market through construction and removed from the market through demolition or deterioration since 1970. In addition, he pointed out that many available housing units are beyond the reach of economic feasibility for the families in greatest need of housing. He testified that the factors involved in assessing the presence or absence of a housing crisis are more than the statistics of population, housing units and vacancy rate. There must also be considered the income of those in need of housing, the rents demanded by the owners, the age and obsolescence of existing buildings, the amount and cost of new construction, the effect of increased taxes on private construction, the relocation of families because of government subsidized housing developments, and many other variables relating to the social composition of the residents of the city.
It is unnecessary to detail in full the testimony of the expert or the contents of the report. The unequivocal conclusion from this evidence is that there is an acute shortage and *111 demand for housing, particularly in the lower rental categories.
Plaintiff urged that the availability of housing units must be tested by the area rental market, which includes municipalities contiguous to Jersey City. There is some merit to this contention, for the number of available housing units cannot realistically be circumscribed by a mere border between municipalities. From a practical standpoint, however, if a single municipality is empowered by law to adopt rent control legislation, the factual pattern for the determination of the existence of a housing emergency must of necessity be measured by the conditions in that municipality. Otherwise there could be no limit to the potential of housing facilities in neighboring municipalities, nor in the indeterminable variables relating to the economic status of the residents in the various municipalities, the availability of transportation to places of employment, school ties, family relationships, etc. Such a limitless panorama would lead to the absence of any finite basis for conclusion.
The municipal governing body is justified in considering the conditions within its own domain, so long as the state legislature and the courts have invested it with the right to legislate locally on the subject matter. And, as a consequence, the court should utilize the same factual standard in testing the reasonableness of the municipal action.
It should be noted, of course, that a rent control ordinance does not cure a housing shortage, since such a condition can only be remedied by massive rehabilitation and construction. The object of the ordinance is rather to prevent exorbitant rental increases in a milieu where tenants are deprived of the ability to secure other housing. The absence of a competitive housing market destroys the normal balance of a free enterprise approach in this vital area affecting the health and welfare of the residents of the community.
Because of this the governing body considered not only the reports and data as to the availability of housing facilities but also information relating to rent increases demanded by *112 some landlords in a test period between the termination of federal controls on January 11, 1973 and the end of March 1973. The Mayor's Action Bureau received approximately 350 complaints, and there was introduced into evidence a list of these specific instances, detailing the names of the tenants, the addresses, and the rentals before and after the increase. From this sampling there is a substantial showing of exorbitant rent increases which in part support the conclusions made by the municipal council in the preamble to the ordinance.
Based upon all the evidence on this subject and the reasonable inferences therefrom, the court concludes that an emergency exists in the area of housing in Jersey City which amply supports the exercise of the police power by the municipality. The plaintiff has failed to sustain his burden to prove the contrary.

Retroactive Provisions of Ordinance
The ordinance was adopted on February 20, 1973 and became effective on March 12, 1973. By its terms it provides for a rollback of rents to the levels in existence on January 11, 1973 and invalidates rental provisions contained in any agreements entered into subsequent to that date. This proviso was included to create a continuity of controls which had existed on a federal level prior to January 11, 1973.
Plaintiff attacks this provision for retroactivity on the ground that it impairs the obligation of contracts entered into between plaintiff and tenants between the base date of January 11, 1973 and the effective date of the ordinance as being violative of U.S. Const., Art. I, § 10 and N.J. Const. (1947), Art. IV, § VII, par. 3.
It is well settled that legislation which is necessary for the protection of the health, safety and welfare of the public within the police power of the state or its subdivisions may alter or abrogate existing contractual rights without affecting its validity under the foregoing constitutional *113 prohibitions. City of El Paso v. Simmons, 379 U.S. 497, 508, 85 S.Ct. 577, 13 L.Ed.2d 446 (1964); Veix v. Sixth Ward B. & L. Ass'n, 310 U.S. 32, 38-40, 60 S.Ct. 792, 84 L.Ed. 1061 (1939); Home B. & L. Ass'n v. Blaisdell, 290 U.S. 398, 428, 54 S.Ct. 231, 78 L.Ed. 413 (1933); Brookchester v. Ligham, 17 N.J. 460, 467 (1955). The constitutional interdiction against impairment of contracts is not an absolute one. City of El Paso v. Simmons, supra, 379 U.S. at 508, 85 S.Ct. 577; N.J. Sports & Exposition Auth. v. McCrane, 119 N.J. Super. 457, 563 (Law Div. 1971), mod. 61 N.J. 1 (1972). Every contract is made subject to the condition that its fulfillment may be frustrated by a proper exercise of the police power. Veix v. Seneca B. & L. Ass'n, 126 N.J.L. 314, 320 (E. & A. 1941); American Budget Corp. v. Furman, 67 N.J. Super. 134, 144 (Ch. Div. 1961), aff'd 36 N.J. 129 (1961).
The rights of private individuals, whether codified by contract or not, must bow to the paramount right of government under its police power to adopt laws which are necessary for the health, safety and welfare of the public. The only caveat to this overriding power is that the legislation must be reasonable in its effort to achieve the intended purpose and that it shall not constitute an arbitrary exercise of power. Brookchester, supra, 17 N.J. at 466; National City Bank v. Del Sordo, 16 N.J. 530, 542 (1954); Jamouneau, supra, 16 N.J. at 514; Monmouth Lumber Co. v. Ocean Tp., 9 N.J. 64, 71 (1952).
The case of Daniel v. Oakland, 124 N.J. Super. 69 (App. Div. 1973), relied upon by plaintiff, is distinguishable. There, pursuant to N.J.S.A. 40:62-47, the municipality undertook to supply water to residents. Fees were charged by the municipality according to a set schedule. In September 1970 the municipality increased the fees by ordinance, applying such fees retroactively to the previous July. The retroactive amendatory ordinance was struck down under the Federal and State Constitution prohibitions against impairment of contract. The court found that the municipality had effectively *114 entered into a contract with the residents which could not be impaired by retroactive legislation of one of the contracting parties. More significantly, the municipality was engaged in a private or proprietary function. The impairment did not result from nor could be justified by the requisite police power authority. In substance, therefore, the municipality, without police power justification, unilaterally altered its contract with the residents for its benefit. The opinion of the Appellate Division in Daniel has no impact upon the issue before this court which involves the exercise of governmental police power.
The court has already concluded that overall rent control is reasonable because of the existence of an emergency and that the exercise of the police power is warranted under the existing factual circumstances. The additional feature of retroactive application of the ordinance is intended to fill the void which was created by the termination of federal rent controls. It serves the fair and legitimate purpose of equal treatment of landlords and tenants by eliminating the unfair advantage gained by those owners who moved quickly to increase rents the moment that federal regulations were lifted. Such owners undoubtedly acted in anticipation of impending state or local legislation. In this area, celerity should not be rewarded.
The retroactivity provision therefore has a rational public purpose under the existing circumstances. Its tie-in to the point of time of elimination of federal controls constitutes a reasonable exercise of police power uninhibited by the cited constitutional provisions.

Applicability to Buildings Containing More than Four Units
It is asserted that the ordinance is invalid because it applies only to buildings containing more than four units. Plaintiff alleges that this classification based upon the number of units is arbitrary and constitutes a denial of equal protection of the laws.
*115 In N.J. Chapter, American Institute of Planners v. N.J. State Board of Professional Planners, 48 N.J. 581 (1967), Justice Francis articulated the guiding principles applicable to legislative classifications:
The constitutional mandate for equal protection does not mean that the regulation must reach every class to which it might be applied  that the Legislature must regulate all or none. The Legislature has wide discretion in the creation of or recognition of classes for different treatment. Equal protection does not require that all persons be dealt with identically. If there is some reasonable basis for the recognition of separate classes, and the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the constitution is not offended. [at 601]
Equal protection is not denied because a regulatory statute might have gone farther than it did, or might have included some persons or classes of persons who were excluded. Regulatory need in a particular field may appear to the legislative mind in different dimensions and proportions; as more acute in one area than in another. Consequently the reform may proceed one step at a time, addressing itself to the aspect of the problem which seems the most pressing * * *. In short, equal protection does not demand immediate logical tidiness; nor is it violated because the legislation as enacted does not bring about the full reform or result intended to be produced. In an area of many competing pressures the constitution is satisfied if the Legislature, in responding to what it conceived to be living facts calling for regulation, did not disregard reason in drawing its lines. That those lines might have been drawn more suitably in light of the whole problem is not a matter for judicial re-examination. Classification is a perennial and difficult problem, capable of no doctrinaire solution. Basically the solution resides in the legislative domain and the judiciary will not intrude unless the classes established for separate treatment represent invidious discrimination, that is, treatment which has no rational basis in relation to the specific objective of the regulatory legislation. [at 602-603, cases omitted]
See also, Woods v. Cloyd W. Miller Co., 333 U.S. 138, 145, 68 S.Ct. 421, 92 L.Ed. 596 (1948).
Plaintiff's reliance for its position on this point upon the opinion in Brookchester, supra, is inapposite. The Supreme Court in that case held that a rule of the State Rent Control Director limiting regulations of rent control to new buildings with 50 or more units was invalid because the Director sought thereby to classify on a quantitative basis under *116 enabling legislation which empowered him to make classifications and differentiation only "according to the use or character" of the property. Brookchester, supra, 17 N.J. at 470. The Supreme Court holding therefore was confined to the invalidity of the classification as an ultra vires act of an administrative agency beyond the power granted by the legislation creating the agency. Such a holding, regardless of the articulation leading thereto, is not a precedent which controls in a case involving a classification by a local legislature untrammelled in its police power by state legislation. In the latter case the sole criterion for testing the validity of the classification is whether it meets the test of rationality in relation to the objective of the local legislation.
The proofs before the court demonstrate that a great percentage of buildings with units up to four families are owner-occupied, and profit is not the dominant motive as is the case with absentee owners. In addition, only 10% of the complaints relating to rent increases after January 10, 1973 were from tenants in buildings having less than five families. The governing body concluded that it was unnecessary to control the rents in smaller buildings with less than five units, and that the emergency resulting from the pattern of excessive increases was mainly centralized in the larger buildings. It therefore determined that the object of the ordinance would be accomplished by imposing its regulations upon buildings having five or more dwelling units.
This solution is within the power of the local legislature. It does not represent an invidious discrimination and is based upon rational grounds. Although the legislation could have been made applicable to all rentals, and although other suggestions might be made for a different point of demarcation, the court has no right to interfere with the legislative discretion so long as the result comports with rationality.

Consumer Price Index
The ordinance stabilizes the rentals as of January 11, 1973 but authorizes an automatic increase equal to the percentage *117 difference between the Consumer Price Index (CPI) for this metropolitan region for the three-month period prior to the termination of the tenancy and the CPI for the three-month period prior to the commencement of the tenancy. The CPI purports to measure the "changes in prices of goods and services bought by urban wage earners and clerical workers." The Consumer Price Index, A Short Description 1 (U.S. Dept. of Labor 1971). It is popularly called a "cost of living" index. And the annual percentage increase of the CPI admeasures the price changes from the previous year in the area of the test products and services.
The categories of consumer goods and services which make up the statistical findings include: food; housing, including rent and expenses for home ownership such as taxes, insurance, maintenance and repairs; fuel and utilities; household furnishings and operation; apparel; transportation; health; recreation; tobacco; alcoholic beverages, and personal expenses.
Plaintiff complains of the use of the CPI as a standard for authorizing a rent increase. He argues that the weight given to the component parts of the CPI demonstrates that the index has no reasonable relationship to a fair rental or the cost of operating a building. He points to a New York City price index for operating costs of apartment houses as a more reasonable guide to evaluate the fairness of the rent increase.
It is also suggested that the ordinance contains no provision for comparability as a test of fair rental value, and that statutory rent controls in the past have provided other means to insure to the owner a fair return on his investment.
In essence, plaintiff urges that the Jersey City ordinance stabilizes rents for the benefit of tenants but fails to allow landlords a fair and equitable return on their investment. See Friedman v. Podell, 21 N.J. 100, 104 (1956); Jamouneau, supra, 16 N.J. at 527.
*118 This challenge requires a brief review of the scheme of the allowable rent increases in the ordinance. Although rents are frozen at the applicable level of January 11, 1973, there are several areas of permissible increases based upon changes in circumstances affecting the landlord's return. First, as already noted, an increase in the CPI authorizes the landlord to impose an equal increase in each tenant's rent. Second, a tax increase permits a rent surcharge apportioned among all the tenants in the building. Third, the cost of a capital improvement may be recouped over the useful life of the improvement by appropriate rent increases. Fourth, if, regardless of the aforesaid rent adjustments, the landlord can demonstrate that the income is insufficient to meet his mortgage payments and maintenance, he may apply to the Board for further increased rentals.
It can be seen that the potential increases allowed in the ordinance are added to a base created by the landlord himself in his pre-January 11, 1973 relationship with the tenants. It is not computed upon a base rent dictated or created arbitrarily by the governing body or the Rent Leveling Board. Hence, it can be reasonably assumed that the voluntary act of the landlord in setting the rent prior to the effective date of stabilization was done with a consciousness of producing at least a fair return on investment.
If that is so, the provisions for rent increases super-imposed upon the landlord's concept of a fair rental constitute a rational technique for arriving at a conclusion seeking fair treatment to the tenant and the landlord. The mere fact that there may be other methods, even more preferable, to achieve the same end does not dictate that the method selected by this governing body is invalid. If it is not arbitrary and reasonably achieves the intended purpose with due regard to the property rights of the landlord as well as the needs of the tenants, it passes judicial muster. The court cannot supplant the local legislature's discretion with its own opinion of alternative methods of dealing with the subject matter. The municipal action is beyond judicial intrusion.
*119 The prime target of plaintiff's attack is the alleged unwarranted use of the CPI as a measuring stick for a permissible rent increase. Although the CPI is not attuned exclusively to the cost factors involved in operating an apartment house, it serves as a convenient and logical barometer which measures inflation. The index is prepared by experts of the U.S. Labor Department based upon reliable field samplings and inquiries. It is used as a national barometer to measure the changes in the cost of living and is refined to apply to different sections of the country. Despite the possibility of error, the statistical methods used to arrive at conclusions are sufficiently accurate to depict the economic trend.
The components include the major consumer items which, of necessity, incorporate the labor costs involved in furnishing the products and services. In addition, it also includes rental and maintenance costs for owned buildings. It is clearly reasonable to apply the same standard for apartment rental increases as that which reflects the cost of living increase in the area. There is a logical nexus since rent is part and parcel of the cost of living and should in a normal housing market keep pace with that index.
As noted by the Department of Labor in The Consumer Price Index, a Short Description, supra:
The Consumer Price Index is used widely by the general public to guide family budgeting and to understand what is happening to family finances. It is used extensively in labor-management contracts to adjust wages. Automatic adjustments based on changes in the index are incorporated in some wage contracts and in a variety of other types of contracts, such as long-term leases. In addition, the CPI is used as a measure of changes in the purchasing power of the dollar for such diverse purposes as adjusting royalties, pensions, welfare payments, and occasionally alimony payments. It also is used widely as a reflection of inflationary or deflationary trends in the economy. [at 2]
Where the index is used so widely as a means of measuring requisite adjustments in various sectors of our society and economy, it is wholly reasonable for a governing body *120 to resort to such an available statistic to measure the adjustment of rents in the landlord-tenant relationship. It may not represent perfection but it cannot be said that the use of such an index is so arbitrary as to warrant judicial interference.

Rent Surcharges for Tax Increase, Capital Improvements and Hardship
Section 5 of the ordinance as originally adopted on February 20, 1973 provided that an increase in property taxes may be recouped by the landlord through a rent increase. The formula contained therein authorized the landlord to divide the amount of the tax increase for the year by the total number of square feet in the building and to surcharge each tenant in an amount representing the result of the multiplication of the per square foot increase by the number of square feet occupied by the tenant. This formula failed to allocate among the tenants the burden of increased taxes applicable to the common areas of the building, such as lobbies, halls, stairways, basements, etc. In effect, the ordinance provision unfairly compelled the landlord to absorb a substantial portion of a tax increase.
This inequity was corrected by the amendatory ordinance of November 20, 1973 which grants the landlord the option of two alternative methods of calculation: (1) by dividing the total tax increase by the number of square feet of the rentable portions of the building and imposing a surcharge computed by multiplying the tax increase per square foot by the amount of space occupied by each tenant, or (2) by dividing the total tax increase by the number of available rooms in the building to obtain the tax increase per room, and imposing a tax surcharge computed by multiplying this tax increase per room by the number of rooms occupied by the tenant.
By application of either of these methods, the total tax increase is borne by the tenants, and the landlord is thereby granted sufficient additional income to pay for the increased *121 expenditure. Such a provision is fair and equitable to both landlord and tenants, and contains no infirmity subject to judicial intrusion.
Section 10 of the ordinance, as amended on November 20, 1973, makes provision for application by the landlord to the Rent Leveling Board for a rental surcharge for "capital improvements or services." The Board is authorized to grant such a rent increase, after hearing, if the improvement is truly a capital one. Under such circumstances, the ordinance outlines guidelines for computing the rent increase by arriving at the annual cost based upon the useful life of the improvement, and then apportioning that cost among the tenants by a rent surcharge calculated to shift the total cost of the capital improvement to the tenants.
Although the original ordinance had some features which compelled the landlord to absorb part of the cost of the capital improvement and also imposed a percentage limitation on the allowable increase authorized by this section, the amendment to the ordinance cured these features. As a consequence, there can be no viable objection to the current section which permits the recoupment from the tenants of the cost of the capital improvement after a due process hearing before the Board.
In addition to provisions for the foregoing surcharges, the ordinance also authorizes an application for a hardship increase in the event that a landlord cannot meet his mortgage payments (including amortization) and maintenance costs. This provision represents an avenue of relief available to a landlord in the event that he is in a financial dilemma after the utilization of the benefits of a CPI increase, tax surcharge, or capital improvement increase.
Plaintiff contends that none of the ordinance provisions affirmatively takes into account the factor of a fair profit or investment return to the landlord. Although the ordinance is not couched in terms of percentage of profit or return to the landlord, the total effect, as the court has already observed, *122 incorporates a built-in assurance of a fair return on investment. And this ensues from the fact that all increase provisos are built upon the rental base created by the landlord prior to January 11, 1973.
Undoubtedly, there are and have been many varied techniques adopted by legislatures in the ambit of rent control legislation. And in some instances the landlord has been permitted to secure rent increases upon a showing that he is unable to obtain a fair return on his investment.
Nevertheless, it is not for the court to dictate the particular method by which the local legislature seeks to accomplish its purpose of rent stabilization. Even if there may be more preferable techniques of regulation, the legislative judgment must prevail. Of course, the municipal power is not limitless, but if its exercise is not arbitrary and represents a reasonable regulation of the rights and interests of landlords and tenants within the ambit of the purpose of the legislation, the validity of the ordinance must be sustained.
The court finds that the provisions for tax, capital improvement and hardship increases represent a reasonable exercise of police power when considered with the overall scheme of the total ordinance.

Conclusion
Plaintiff's other challenges to the ordinance have been considered and found to be without merit.
Judgment will be entered in favor of defendant sustaining the validity of the Jersey City Rent Stabilization Ordinance.