WESTCHESTER WEST NO. 2 LIMITED PART-
NERSHIP ET AL. *v.* MONTGOMERY
COUNTY, MARYLAND ET AL.

[No. 32, September Term, 1975.]

*Decided December 18, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY,
SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Ronald L. Early,* with whom were *Lerch, Pillote & Lerch* on the brief, for appellants.

*Stephen J. Orens, Assistant County Attorney,* with whom were *Richard S. McKernon, County Attorney, Alfred H. Carter, Deputy County Attorney,* and *Sue Levin, Assistant County Attorney,* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

This case presents a challenge to a Montgomery County rent control ordinance on the ground that it constitutes a deprivation of property without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

On September 18, 1973, the Montgomery County Council enacted a rent control law, Bill No. 39-73, codified as Montgomery County Code (1972, 1974 Cum. Supp.), Chapter 29, Article VI, which became effective on October 1, 1973.[1] The law applies to persons owning three or more dwelling units in Montgomery County, and limits rent increases to a maximum of 4% of the base rent, depending on the type of unit involved and the utility services furnished by the landlord.[2] Extraordinary rent increases, in excess of the basic rent increase, may be permitted after certain procedures are followed by the landlord.[3] The ordinance

1. Chapter 29 of the Montgomery County Code (1972), entitled "Landlord-Tenant Relations," was the subject of other litigation in County Council v. Investors Funding, 270 Md. 403, 312 A. 2d 225 (1973). In that case we upheld the basic power of Montgomery County to enact local legislation comprehensively regulating the apartment rental business, while invalidating several provisions which were in conflict with the public general laws of this State. The legislation involved in *Investors Funding* did not attempt to impose rent controls.

2. The "base rent" is defined as the rent charged for the month of September 1973 or, if the unit was not rented that month, the last monthly rent charged. The base rent for new dwellings is the monthly rent charged during its initial leasing period. Montgomery County Code (1972, 1974 Cum. Supp.), Art. VI, § 29-50.

3. These procedures include a request for a rent increase by the landlord to the Office of Landlord-Tenant Affairs. The request must be accompanied by an affidavit containing certain information, and by a copy of notice of the proposed rent increase sent to the tenants, who may file their comments on the rent increase proposal. The landlord is also required, within thirty

450

originally was to expire on October 31, 1975, but it was extended by Montgomery County Council Bill No. 6-75, to December 31, 1975. We were advised at the oral argument in this case that the County Council was considering legislation ιο extend further the rent control law.

The rent control law, Bill No. 39-73, included certain legislative findings made by the County Council, including findings

> "that a public emergency exists in the housing of a considerable number of persons in the county; that there exists a serious housing shortage of dwelling units in the county; that the construction of new housing units planned will not eliminate the existing housing shortage in rental units because of, inter alia, the sewer moratorium; that in the absence of regulations of rents there have ensued excessive rent rises which have resulted in serious impairment to the health, safety and welfare of a large segment of the population and in conditions that would substantially hamper and deter the efforts of the county government to effectuate the protection and promotion of the health, safety and welfare of the citizens of the county as well as the general purposes of planning; ... that ,such regulations and controls are necessary in order to prevent the execution of unjust, unreasonable and oppressive rental agreements, and to forestall profiteering, speculation and other disruptive practices tending to impair the public health, safety and general welfare . . . ." Ch. 29, Art. VI, § 29-47.

Bill No. 6-75, the act extending the termination date of the

days after his request, to file a statement that he has met in good faith with the tenants or their representatives to explain the basis for his request. The Executive Director must then, with or without a hearing, rule on the request. Persons aggrieved by his initial decision may request a hearing before the Executive Director, if none was held previously. Further appeals following a hearing may be taken to the Montgomery County Commission on Landlord-Tenant Affairs, and then to the Circuit Court for Montgomery County.

rent control law, also recited "that an emergency exists and that this legislation is necessary for the immediate protection of public health and safety."

On August 26, 1974, Westchester West No. 2, a limited partnership, along with four other limited partnerships, all owning rental housing property in Montgomery County, filed suit against Montgomery County in the circuit court for that county, seeking to have Bill No. 39-73 declared unconstitutional in that it is based on a non-existent public emergency and therefore "constitutes a deprivation of private property without due process of law."

At trial (before McAuliffe, J.) each side produced one expert witness in support of its respective position. Thomas Hamilton, Executive Director for the Montgomery County Office of Landlord and Tenant Affairs, testified for Montgomery County concerning some of the factors that led to the enactment of the rent control bill. He stated that, in determining the present and future availability of housing, the county was aware of the lack of proper sewage disposal in some areas, and the fact that a sewer moratorium had been imposed on the county. Although pointing out that the full impact of the inflationary spiral in the economy could not have been fully appreciated at the time the bill was proposed, Mr. Hamilton testified that "[w]e did know at the time that resources normally connected with the housing industry were rising in cost, such as, material and labor," thus suggesting a possible decrease in the construction of new housing units. Coupled with this was the knowledge that prospective buyers were having financial problems due to the high cost of homes, inability to obtain mortgages, high down payments, and high interest rates. These factors, according to Mr. Hamilton, prevented tenants normally interested in buying homes from leaving the rental housing market.

Mr. Hamilton further testified that the number of new housing starts decreased from around 2,000 in 1973 to about 400 in 1974. This was due, at least in part, to the high cost of materials, unavailability of financing, and inability to get

sewerage connections. This shortage of new starts would adversely affect the stock available for rental housing.

The record also discloses that additional evidence was presented to the Montgomery County Council in connection with its consideration of the bill. At public hearings held by the council on August 2, 1973, and August 20, 1973, there was testimony both for and against the proposed law. Those in favor of the bill, including some realtors and representatives of several tenant associations, spoke of the low vacancy rates, unfair landlord practices, and fears of unbearable rent increases as a result of unequal bargaining power caused by the tight market. In addition to the oral testimony, letters were received from tenants concerned about what they considered to be exorbitant rent increases.

The county council also considered an apartment project survey which was undertaken by the Montgomery County Office of Community Development, and which was completed on May 22, 1973. The survey showed an overall vacancy rate in rental units of 3.5%. When broken into its component parts, the survey revealed a 26.1% vacancy rate in new units — those 12 months old or less. However, new units constituted a relatively small percentage of the total number of apartments. Mature units, those over one year old, had a vacancy rate of only 1.7%. A 1974 survey update indicated that while the overall vacancy rate climbed to 3.9%, the rate for mature units dropped to .5%. In comparison, the testimony revealed that a 1970 Department of Commerce study reported a 6.6% national vacancy rate, and a 5.0% overall vacancy rate for the state of Maryland.

According to the witness Hamilton, the newer units were largely to be found in the northern sections of the county, such as the area of Gaithersburg. Thus, those units were somewhat distant from the Washington metropolitan area and, consequently, were undesirable to many prospective renters who would have to travel a greater distance to work. Also, the newer northern units were more expensive than comparable units in other parts of the county because, as Mr. Hamilton stated, they were built with "inflated dollars."

The effect of the higher rents in the Gaithersburg area, he said, was to cause people to move toward lower rents outside the area, where the vacancy rate was less than .5%. Mr. Hamilton also testified that the 3.9% overall vacancy rate indicated by the 1974 survey was inflated by an unusually high percentage (20%) of new units in the sample.

The 1973 survey also indicated that vacant units occurred more frequently at higher rent levels. Of units costing less than $200 per month, only .4% were not rented. Over 70% of the projects surveyed reported no vacancies at all.

The evidence showed that another factor contributing to a rental housing shortage was the increase in the population and number of households in Montgomery County. A census survey taken in 1974 by The Maryland-National Capital Park and Planning Commission revealed an 11.5% increase in population and a nearly 20% increase in households in Montgomery County between April 1970 and April 1974.

Finally, the county council feared that the termination of federal rent controls under Phase II of the Economic Stabilization Program on January 11, 1973, would lead to "exorbitant" rent increases.

Dr. Michael Sumichrast, Vice President and Chief Economist of the National Association of Homebuilders, testified in the circuit court on behalf of Westchester West. Dr. Sumichrast said that Montgomery County has experienced an average vacancy rate of about 3.5% since 1950, and that the county's rate has traditionally been lower than that of other jurisdictions in the Washington metropolitan area. But he argued that in arriving at a fair and acceptable vacancy rate for a particular area, the vacancy rates of other geographical areas should not be used for a comparison because of the many variables involved, such as the size and economic growth of the area. He said that for Montgomery County a normal and acceptable vacancy rate would be "in the vicinity of about one and a half to two percent." A 3.5% vacancy rate, he claimed, was "a very acceptable rate, high."

Dr. Sumichrast also stated that most of the available

rental units, "eighty percent, are in garden-types, which . . . are the cheapest units." He also challenged the county's statistical breakdown of the overall vacancy rate into "new" and "mature" units, saying that "[t]here is always one market. It doesn't really make any difference whether it is new or mature." Dr. Sumichrast disputed Mr. Hamilton's conclusion concerning the 1974 survey update, arguing that it did reflect an accurate percentage of new rental units, and that the overall vacancy rate of 3.9% stated in the survey was not artificially high.

After reviewing both the evidence before the county council and the evidence introduced in court, the circuit court concluded that "there existed a rational basis for the enactment of Bill No. 39-73," and that the bill did not constitute a deprivation of private property without due process of law. Westchester West appealed to the Court of Special Appeals, and we issued a writ of certiorari prior to a decision by that court.

Westchester West contends that in the absence of an emergency condition concerning housing shortages, Montgomery County cannot, consistent with the Due Process Clause, impose rent controls. In this case, Westchester West argues that no such emergency exists, and that therefore Bill No. 39-73 deprives it of property without due process of law. Westchester West relies upon several United States Supreme Court cases, the most recent of which was decided in 1924, in which the Court indicated that with respect to rent control, an emergency condition must exist in order to justify the regulation in light of the Due Process Clauses of the Federal Constitution.

This Court has pointed out on numerous occasions that the test for constitutionality of regulatory legislation under the Due Process Clause is whether the statute, as an exercise of the state's police power, "bear[s] a real and substantial relation to the public health, morals, safety and welfare of the citizens of the State." *Steuart Petroleum Company v. Board of County Commissioners of St. Mary's County,* 276 Md. 435, 347 A. 2d 854 (1975); *Bowie Inn v. City of Bowie,* 274

Md. 230, 236, 335 A. 2d 679, 683 (1975); *Md. St. Bd. of Barber Ex. v. Kuhn*, 270 Md. 496, 511, 312 A. 2d 216 (1973); *Md. Bd. of Pharmacy v. Sav-A-Lot*, 270 Md. 103, 106, 311 A. 2d 242 (1973); *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 46, 300 A. 2d 367 (1973); *Allied American Co. v. Comm'r*, 219 Md. 607, 617, 150 A. 2d 421, 427 (1959); *Davis v. State*, 183 Md. 385, 397, 37 A. 2d 880 (1944). However, in applying this test the courts perform a very limited function. Unless the exercise of the police power by the Legislature is shown to be arbitrary, oppressive or unreasonable, the courts will not interfere with it. *Bowie Inn v. City of Bowie, supra*, 274 Md. at 236; *Salisbury Beauty Schools v. St. Bd., supra*, 268 Md. at 48. Moreover, the wisdom or expediency of a law adopted in the exercise of the police power of a state is not subject to judicial review, and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported. *Bowie Inn v. City of Bowie, supra*, 274 Md. at 236; *Sav-A-Lot, supra*, 270 Md. at 106; *Salisbury Beauty Schools v. St. Bd., supra*, 268 Md. at 48.[4]

---

4. The standard for determining the constitutionality of regulatory legislation under the Due Process Clause which this Court has employed, namely whether the "legislation bears a real and substantial relation to the public health, safety, morals or some other phase of the general welfare," was applied by the Supreme Court in Liggett Co. v. Baldridge, 278 U. S. 105, 111-112, 49 S. Ct. 57, 59, 73 L. Ed. 204 (1928). It is noteworthy that Liggett Co. v. Baldridge, *supra*, was recently overruled by the Supreme Court in North Dakota St. Bd. of Pharm. v. Snyder's Drug Stores, Inc., 414 U. S. 156, 166-167, 94 S. Ct. 407, 413-414, 38 L.Ed.2d 379 (1973), where the Court stated in a unanimous opinion:

"The majority of the Court in *Liggett* for which Mr. Justice Sutherland spoke held that business or property rights could be regulated under the Fourteenth Amendment only if the 'legislation bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare,' 278 U.S. at 111-112, 49 S.Ct. at 59. The majority held the Act governing pharmacies 'creates an unreasonable and unnecessary restriction upon private business.' *Id.*, at 113, 49 S. Ct., at 59. The opposed view [was] stated by Mr. Justice Holmes. . . .

\* \* \*

"Those two opposed views of public policy are considerations for the legislative choice. The *Liggett* case was a creation at war with the earlier constitutional view of legislative power. Munn v. Illinois, 94 U.S. 113, 132, 134, 24 L.Ed. 77, and opposed to our

Westchester West, however, claims that there is an exception to the above stated principles for rent control legislation. It relies upon *Block v. Hirsh*, 256 U. S. 135, 41 S. Ct. 458, 65 L.Ed. 865 (1921), and *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 41 S. Ct. 465, 65 L. Ed. 877 (1921), where the Supreme Court upheld District of Columbia and New York rent control laws in light of the emergency conditions created by World War I. In *Block v. Hirsh, supra,* 256 U. S. at 157, the Court explained that "[t]he regulation is put and justified only as a temporary measure. . . . A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." *See,* additionally, *Levy Leasing Co. v. Siegel,* 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595 (1922). In *Chastleton Corp. v. Sinclair,* 264 U. S. 543, 44 S. Ct. 405, 68 L. Ed. 841 (1924), the Supreme Court again considered the rent law it had reviewed in *Block v. Hirsh.* This time, however, the Court decided to remand the case to the lower court to determine if an emergency still existed, stating (264 U. S. at 548), "If about all that remains of war conditions is the increased cost of living that is not in itself a justification of the act."

These early Supreme Court cases must be viewed in the context of the period in which they were decided. At the beginning of the twentieth century, and through the early 1930's, a majority of the Supreme Court was of the view that legislation regulating the amount to be charged for goods

more recent decisions. Olsen v. Nebraska ex rel. Western Ref. & Bond Ass'n, 313 U.S. 236, 241, 61 S.Ct. 862, 85 L.Ed. 1305; Williamson v. Lee Optical Co., 348 U.S. 483, 487-488, 75 S.Ct. 461, 464,· 99 L.Ed. 563; Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 . . . . The *Liggett* case, being a derelict in the stream of the law, is hereby overruled."

It might be argued that the Supreme Court in *North Dakota St. Bd. of Pharm.* was indicating that an even less stringent standard than the "real and substantial relation test," with even greater deference to the legislative judgment than required by that test, is the proper standard to be applied in reviewing, under the due process clauses of the federal constitution, economic regulatory legislation. However, since we shall hereafter conclude that the Montgomery County rent control legislation has a real and substantial relation to the public welfare, we need not consider whether compliance with a lesser standard of review would suffice.

and services generally was unconstitutional, as a violation of due process, unless there was an emergency,[5] or unless the business being regulated was "affected with a public interest."[6]

The Court did not distinguish between rent control and other price and wage control cases in striking down such legislation, or in upholding it under the "emergency" or "affected with a public interest" standards. As indicated by *Tyson & Brother v. Banton*, 273 U. S. 418, 429, 47 S. Ct. 426, 428, 71 L. Ed. 718 (1927), which held unconstitutional a New York statute regulating the maximum price for which theater tickets could be resold, the majority of the Court believed that

> "the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, . . . and, as such, within the protection of the due process of law clauses of the Fifth and Fourteenth Amendments. . . . The power to regulate *property, services or business* can be invoked only under special circumstances [such as businesses affected with a public interest, or emergencies]." (Emphasis supplied.)

And in *Ribnik v. McBride*, 277 U. S. 350, 357, 48 S. Ct. 545, 546, 72 L. Ed. 913 (1928), in holding invalid a statute regulating employment agency fees, the Supreme Court flatly stated that various types of price control legislation, *including rent control legislation*, were on the same footing for purposes of the Due Process Clause, and were all unconstitutional absent a "grave" emergency:

---

5. Wolff Co. v. Industrial Court, 262 U. S. 522, 542, 43 S. Ct. 630, 635, 67 L. Ed. 1103 (1923); Adkins v. Children's Hospital, 261 U. S. 525, 551, 43 S. Ct. 394, 67 L. Ed. 785 (1923); Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755 (1917).

6. O'Gorman & Young v. Hartf'd Ins. Co., 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324 (1931); Tagg Bros. v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524 (1930); Williams v. Standard Oil Co., 278 U. S. 235, 239, 49 S. Ct. 115, 73 L. Ed. 287 (1929); Tyson & Brother v. Banton, 273 U. S. 418, 430, 47 S. Ct. 426, 71 L. Ed. 718 (1927); Wolff Co. v. Industrial Court, *supra*, 262 U. S. at 535.

"Under the decisions of this court it is no longer fairly open to question that, at least in the *absence of a grave emergency* (Tyson & Brother v. Banton, supra, pages 431, 437 [47 S. Ct. 426]), the fixing of prices for food or clothing, *of house rental* or of wages to be paid, whether minimum or maximum, is beyond the legislative power. And we perceive no reason for applying a different rule in the case of legislation controlling prices to be paid for services rendered in securing a place for an employee or an employee for a place." (Emphasis supplied.)

During this period, the Supreme Court invalidated numerous statutes regulating the amount to be charged for goods or services, where there existed no emergency and no "business affected with the public interest." Thus, in *Adams v. Tanner*, 244 U. S. 590, 37 S. Ct. 662, 61 L. Ed. 1336 (1917), the Supreme Court struck down state legislation regulating the fees charged by employment agencies. In *Adkins v. Children's Hospital*, 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785 (1923), the Court ruled a District of Columbia minimum wage law unconstitutional. The Court held in *Fairmont Co. v. Minnesota*, 274 U. S. 1, 47 S. Ct. 506, 71 L. Ed. 893 (1927), that Minnesota lacked the power to regulate the price of milk within the state. And in *Williams v. Standard Oil Co.*, 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287 (1929), the Court held unconstitutional a Tennessee law regulating the price of gasoline within the state.

However, where the business was considered "affected with a public interest," or where an emergency condition was found to exist, the Court sustained price and wage controls. For example, in *German Alliance Ins. Co. v. Lewis*, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011 (1914), the Court considered the business of insurance so far affected with a public interest as to justify regulation of its rates. *See* additionally *O'Gorman & Young v. Hartf'd Ins. Co.*, 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324 (1931); *Tagg Bros. v. United States*, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524 (1930) (holding the business of stockyards as "affected with a

public interest" so as to justify regulation of rates charged). In *Wilson v. New*, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755 (1917), the Court held that Congress could temporarily fix wages when faced with an emergency caused by a threatened nationwide strike of railroad workers. *See also Highland v. Russell Car Co.*, 279 U. S. 253, 49 S. Ct. 314, 73 L. Ed. 688 (1929), upholding a Presidential order fixing the maximum price of coal during World War I.[7]

Beginning with *Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940 (1934), however, the Supreme Court has generally upheld price control legislation under the Due Process Clause regardless of whether an emergency existed or whether the business was one affected with the public interest. *Nebbia v. New York* involved a challenge under the Fourteenth Amendment to a New York statute which permitted a state board to fix minimum and maximum retail prices for milk. The Court found "that the dairy industry is not, in the accepted sense of the phrase, a public utility." And no finding was made by the Court concerning the existence of an emergency. Nevertheless, the Court held the statute constitutional, rejecting the notion that only special circumstances can justify economic regulatory legislation.

> "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. . . . If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are

---

7. The Supreme Court's holdings that the legislature cannot fix charges for goods and services absent an emergency or a "business affected with the public interest" was an aspect of the Court's more general approach which was to invalidate under the due process clauses all regulation of private economic affairs which the majority of the Court thought to be unwise. See the discussions in North Dakota St. Bd. of Pharm. v. Snyder's Drug Stores, Inc., 414 U. S. 156, 94 S. Ct. 407, 38 L.Ed.2d 379 (1973); Ferguson v. Skrupa, 372 U. S. 726, 83 S. Ct. 1028, 10 L.Ed.2d 93 (1963).

neither arbitrary nor discriminatory, the requirements of due process are satisfied . . . ." 291 U. S. at 537.

Moreover, the Court said that there was nothing unique or different about wage or price control legislation, and that the same tests of constitutionality applied (*id.* at 532, 539):

> "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. *Munn v. Illinois*, 94 U. S. 113, 24 L. Ed. 77 (1876).

> \* \* \*

> "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

See also *Sunshine Coal Co. v. Adkins*, 310 U. S. 381, 60 S. Ct. 907, 84 L. Ed. 1263 (1940) (sustaining the power of Congress to regulate coal prices in the Bituminous Coal Act of 1937).

*Nebbia v. New York* represented a major departure from the Supreme Court's prior approach to legislation regulating charges for goods or services. Three years later, in *West Coast Hotel Co. v. Parrish*, 300 U. S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937), the Court sustained a Washington state minimum wage law for women and minors. In doing so, the Court overruled *Adkins v. Children's Hospital, supra,* 261 U. S. 525, describing "the *Adkins* case . . . [as] a departure from

the true application of the principles governing the regulation by the State of the relation of employer and employed." 300 U. S. at 397. The Supreme Court stated that the decision to adopt minimum wage requirements "cannot be regarded as arbitrary or capricious and that is all we have to decide. Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment." 300 U. S. at 399.

In *Olsen v. Nebraska*, 313 U. S. 236, 247, 61 S. Ct. 862, 865, 85 L. Ed. 1305 (1941), the Supreme Court left no doubt that the previous "standards by which the constitutionality of the economic and social programs of the states is to be determined" no longer had "vitality." *Olsen v. Nebraska* involved a challenge to a state statute fixing the maximum compensation which a private employment agency might collect from an applicant. The Supreme Court of Nebraska held the statute unconstitutional, relying on *Ribnik v. McBride, supra,* which, as previously discussed, had held unconstitutional a New Jersey law empowering the state Commissioner of Labor to regulate employment agency fees. The Supreme Court in *Olsen v. Nebraska* reversed the state decision, saying that "[t]he drift away from *Ribnik v. McBride, supra,* has been so great that it can no longer be deemed a controlling authority." The Court reviewed the cases subsequent to *Ribnik v. McBride* which upheld legislative price fixing, such as *Nebbia v. New York, supra,* 291 U. S. 502; *West Coast Hotel Co. v. Parrish, supra,* 300 U. S. 379; *United States v. Rock Royal Co-Operative, Inc.,* 307 U. S. 533, 59 S. Ct. 993, 83 L. Ed. 1446 (1939); and *Sunshine Coal Co. v. Adkins, supra,* 310 U. S. 381. The Court concluded (313 U. S. at 245-246, emphasis supplied):

> "These cases represent more than scattered examples of constitutionally permissible price-fixing schemes. They represent in large measure a basic departure from the philosophy and approach of the majority in the Ribnik case. The standard there employed, following that used in Tyson & Brother v. Banton, 273 U. S. 418, 430 et seq.,

47 S. Ct. 426, 428 et seq., 71 L. Ed. 718, 58 A.L.R. 1236, was that the constitutional validity of price-fixing legislation, *at least in absence of a so-called emergency*, was dependent on whether or not the business in question was 'affected with a public interest.' . . . That test, labelled by Mr. Justice Holmes in his dissent in the Tyson case, 273 U. S. at page 446, 47 S. Ct. at pages 433, 434, 71 L. Ed. 718, 58 A.L.R. 1236, as 'little more than a fiction,' was discarded in Nebbia v. New York, supra, 291 U. S. at pages 531-539, 54 S. Ct. at pages 513-516, 78 L. Ed. 940, 89 A.L.R. 1469. . . .

\* \* \*

"The Ribnik case, *freed from the test which it employed*, can no longer survive."

*Olsen v. Nebraska* therefore overturned *Ribnik v. McBride*, as well as *Williams v. Standard Oil Co., supra, Tyson & Brother v. Banton, supra*, and other cases which relied on special circumstances to justify legislative price and wage controls. The Court in *Olsen v. Nebraska* flatly overruled the test, relied on by Westchester West in the instant case, that state price control legislation can only be sustained under the Fourteenth Amendment's Due Process Clause, if an emergency condition or a business affected with a public interest is involved.[8]

---

8. The Supreme Court has most recently dealt with the question of rent controls in Bowles v. Willingham, 321 U. S. 503, 64 S. Ct. 641, 88 L. Ed. 892 (1944), and Woods v. Cloyd W. Miller Co., 333 U. S. 138, 68 S. Ct. 421, 92 L. Ed. 596 (1948). In both cases, Congress had enacted rent control legislation pursuant to its war power. The Supreme Court in Bowles v. Willingham rejected arguments that the legislation was invalid because it involved an unconstitutional delegation of congressional power to the Administrator of the Office of Price Administration, and that it violated the Due Process Clause because the uniform maximum rent might be unfair to particular landlords. In Woods v. Cloyd W. Miller Co., the Court sustained under the war power rent controls enacted in 1947, despite contentions that Congress did not act under its war power because it had allegedly failed to invoke this power in the legislation, or because with the termination of World War II Congress had no authority to act under the war power. In light of the Supreme Court's holdings in both cases that the legislation was an exercise of Congress's war power, which obviously involves an emergency, the Court

We conclude therefore that the constitutionality of the Montgomery County rent control law does not depend upon the existence of an emergency shortage in rental housing. We recognize that the Supreme Court has not *expressly* overruled the early rent control cases such as *Chastleton Corp. v. Sinclair, supra,* 264 U. S. 543, and that courts in some other jurisdictions have continued to use the "emergency" standard in reviewing under the due process clauses rent control legislation.[9] Nevertheless, we agree with the United States Court of Appeals for the Second Circuit in *Eisen v. Eastman,* 421 F. 2d 560, 567 (2d Cir. 1969), *cert. denied,* 400 U. S. 841 (1970), where Judge Friendly said for the court with regard to a New York City rent control law:

> "[W]e have no doubt that . . . [the United States Supreme Court] would sustain the validity of rent control today. . . . The time when extraordinarily exigent circumstances were required to justify price control outside of the traditional public utility areas passed on the day that *Nebbia v. New York* . . . was decided."

And *see* Baar and Keating, *The Last Stand of Economic Substantive Due Process — The Housing Emergency Requirement for Rent Control,* 7 The Urban Lawyer 447 (1975).

Consequently, whether or not the Montgomery County

---

had no occasion to deal with the question of whether rent controls could be imposed consistent with the Due Process Clause absent an emergency. It is noteworthy, however, that in discussing the restraints imposed on the national government by the Due Process Clause of the Fifth Amendment, the Court relied on Nebbia v. New York, *supra.* Bowles v. Willingham, *supra,* 321 U. S. at 518. The Court did not appear to treat rent control legislation differently from other price-fixing legislation for purpose of the Due Process Clause, saying: "We need not determine what constitutional limits there are to price-fixing legislation. Congress was dealing here with conditions created by activities resulting from a great war effort." *Id.* at 519.

9. Kress, Dunlap & Lane, Ltd. v. Downing, 286 F. 2d 212 (3d Cir. 1960); Birkenfeld v. City of Berkeley, 49 Cal.App.3d 464, 122 Cal. Rptr. 891 (1975); City of Miami Beach v. Fleetwood Hotel, Inc., 261 So. 2d 801 (Fla. 1972); Albigese v. Jersey City, 127 N.J.Super. 101, 316 A. 2d 483 (1974); Lincoln Building Associates v. Barr, 1 N.Y.2d 413, 153 N.Y.S.2d 633, 135 N.E.2d 801 (1956); Warren v. City of Philadelphia, 387 Pa. 362, 127 A. 2d 703 (1956).

rent control law is valid under the Due Process Clause of the Fourteenth Amendment depends on whether the "statute, as an exercise of the state's police power, bears a real and substantial relation to the public health, morals, safety, and welfare of the citizens of this state." *Bowie Inn v. City of Bowie, supra,* 274 Md. at 236, and cases therein cited. There is a strong presumption in favor of the constitutionality of a legislative act. *Ibid.; Salisbury Beauty Schools v. St. Bd., supra,* 268 Md. at 48-49. As stated by Judge O'Donnell for the Court in the *Salisbury Beauty Schools* case, 268 Md. at 49, "if any state of facts reasonably can be conceived that would sustain the constitutionality of the statute within the exercise of the police power, the existence of that state of facts as a basis for the passage of the law must be assumed."

In this case, the record is more than adequate to show a real and substantial relationship between Bill No. 39-73 and the public health, morals, safety and welfare. The evidence presented by Montgomery County showed a shortage of rental housing that was likely to worsen by reason of fewer housing units being constructed, a swift increase in the county population and number of households, and a lowering of the vacancy turnover rate because of the financial inability of tenants to purchase homes. The Montgomery County bill was a temporary measure addressed to those evils which the county council, through a number of surveys, public hearings and other sources, had identified. Among other things, the bill was intended to prevent exorbitant rent increases caused by the inability of the tenants to secure other housing. On the other hand, landlords are protected by the law's procedures permitting rent increases exceeding the allowable basic annual increases, if the landlords can show a need for such extraordinary increases. We conclude that there is ample basis to support the rent control law as a reasonable exercise of the state's police power.[10] Consequently, the Montgomery

---

**10.** Montgomery County argues alternatively that even if an "emergency" is required to sustain rent control legislation under the Due Process Clause, such an emergency condition exists here. In light of our decision that the existence of an emergency is not necessary to sustain the rent control law, we do not reach the county's alternate contention.

County rent control ordinance does not violate the Due Process Clause of the Fourteenth Amendment.[11]

*Decree affirmed.*

*Appellants to pay costs.*

---

11. While Westchester West's reliance has been upon cases involving the Due Process Clauses of the Federal Constitution, the result in this case would not be changed by the due process provision of the Maryland Constitution. Art. 23 of the Maryland Declaration of Rights provides that "[n]o man ought to be . . . deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." This Court has long equated Art. 23 with the Due Process Clause of the Fourteenth Amendment. *E.g.*, Bowie Inn v. City of Bowie, *supra*, 274 Md. at 235, n. 1; In re Easton, 214 Md. 176, 187, 133 A. 2d 441 (1957); Solvuca v. Ryan & Reilly Co., 131 Md. 265, 270, 101 A. 710 (1917); Pub. S. Com. v. N. C. Rwy Co., 122 Md. 355, 386, 90 A. 105 (1914); Baltimore Belt R.R. v. Baltzell, 75 Md. 94, 99 23 A. 74 (1891).