ROCKVILLE GROSVENOR, INC. ET AL. V.
MONTGOMERY COUNTY,
MARYLAND ET AL.

\* \* \*

APARTMENT AND OFFICE BUILDING ASSOCIATION
ET AL. V. MONTGOMERY COUNTY,
MARYLAND ET AL.

[No. 146, September Term, 1979.]

*Decided November 13, 1980.*

The cause was argued before Murphy, C. J., and Smith, Digges, Eldridge, Cole, Davidson and Rodowsky, JJ.

*James J. Cromwell,* with whom were *James W. Tavel, John W. Neumann* and *Spriggs, Cromwell, Myers, Nicholson & Spire, P.A.* and *Barry M. Fitzpatrick* and *McKeever, Fitzpatrick & Canada* on the brief, for appellants.

*Clyde H. Sorrell, Assistant County Attorney,* with whom were *Paul A. McGuckian, County Attorney,* and *Robert G.*

*Tobin, Jr., Deputy County Attorney,* on the brief, for Montgomery County, Maryland et al.; and by *Kenneth B. Tecler* for Housing Opportunities Commission of Montgomery County, appellees.

RODOWSKY, J., delivered the opinion of the Court. COLE and DAVIDSON, JJ., concur in part and dissent in part. DAVIDSON, J., filed an opinion concurring in part and dissenting in part at page 104 *infra,* in which COLE, J., joins.

In the summer of 1979 the County Council of Montgomery County enacted a series of local laws in response to its finding that there was a shortage of rental housing as a result of conversions of apartment developments from rental facilities to condominium regimes. Owners of apartment projects challenged these laws in two actions in the Circuit Court for Montgomery County. They were only partially successful and have appealed from the denial of the balance of the relief claimed. There are no cross-appeals. We granted certiorari in the consolidated appeals prior to consideration by the Court of Special Appeals. The statutes principally in issue relate to (1) converter liability to displaced tenants for relocation expense, and (2) a right conferred on certain organizations to buy an entire rental facility which is proposed for condominium conversion. Because these provisions of local law conflict with the Horizontal Property Act (HPA), Maryland Code (1974, 1980 Cum. Supp.), §§ 11-101 through 11-128 of the Real Property Article, we shall reverse as to those aspects.

I

There has been local regulation relating to the sale of condominium units in Montgomery County beginning with 1974 Laws of Montgomery County, ch. 58, § 1 which added Chapter 11A, title, "Condominiums," to the Montgomery County Code (1972). This was basically a consumer protection disclosure statute. A developer of a condominium was required to prepare a "property report" setting forth specified information concerning the developer and the

physical, legal and financial aspects of the project. The property report was to be filed with the Montgomery County Office of Consumer Affairs and furnished to prospective purchasers. In conversion situations, written notice to each tenant prior to conversion, together with a property report, were to be furnished by the developer. As first enacted the notice period under county law was 120 days.[1]

These appeals involve at least 6 local laws dealing with condominium conversion which were enacted between July 3, 1979 and February 12, 1980. According to a study[2] transmitted by the County Executive to the County Council on July 3, 1979 approximately 10,400 apartment and townhouse units in the county had been converted from rental to ownership during the period January 1969 through May 1979. Of some 67,900 units originally constructed for rental operation, about 15.3% had been converted, leaving a net rental stock of roughly 57,500. Approximately 5,422 units had been converted during 1972-1975. In the period January 1978 through May 1979, 4,000 units were converted or scheduled for conversion.[3]

---

**1.** The 120 day period originally enacted was consistent with public general law, Md. Code (1974, 1974 Cum. Supp.), § 11-102.1 of the Real Property Article as added by Ch. 704 of the Acts of 1974. By Ch. 786 of the Acts of 1975 the notice under § 11-102.1 of the Real Property Article was increased to 180 days. Mont. Co. Code, § 11A-5 (a) was amended July 20, 1979 by Bill 46-79 to increase the notice period under county law to 180 days.

**2.** Report of the Cooperative Group on Condominium Conversions dated July 2, 1979.

**3.** The July 2, 1979 report describes the economic forces underlying the conversion trend as follows:

1. A limited supply of developable ground exists within the County which:
   (a) Forces residential property values to increase at abnormal rates;
   (b) Encourages developers to look at conversions as a source of business activity as a substitute for new construction.
2. The 1972 tax reform act eliminated accelerated depreciation for old apartment buildings. This discourages acquisition of older apartment properties for continued rental operation by investors seeking tax shelter.
3. Many of the rental properties now being converted are running out of depreciation and must be turned over through acquisition by new owners. The majority of ready buyers for existing rental properties appear to be converters.

Emergency legislation, effective July 6, 1979, was enacted by county council Bill 37-79. It provided for the developer or converter to reimburse up to $750 of the cost of relocation to displaced tenants. Bill 37-79 was amended by Bill 46-79, an emergency bill effective July 20, 1979. Bill 46-79 contained four provisions which appellants contest.

1. *60 day filing.* Montgomery County Code, § 11A-4 (a) was amended to provide that a "developer[4] ... shall not enter into a binding contract ... for the sale of any condominium unit unless ... [a] copy of a property report ... is filed ... at least sixty days prior to the first offering or at least sixty days prior to the notice of conversion to tenants." Prior to this amendment the minimum interval between filing the property report and the first sale of a unit was 10 days.

---

4. Converters appear to be willing and able to pay 30% to 50% more for rental properties than purchasers interested in continuing such properties on a rental basis.

5. Suitable refinancing to support acquisition and continued operation of rental properties appears almost non-existent.

6. Increased government regulations[,] stepped up code enforcement activities, extensive reporting requirements under the rent stabilization program, rapidly rising operating costs, and "implied" restrictions on rental income are breaking down the resolve of landlords to properly maintain their properties and keep them on a rental basis. It is disturbing to discover the number of major rental properties reporting negative cash flows where owners, for unknown reasons, have not sought relief from OLTA through approval of necessary rent increases.

7. The current Federal and State income tax laws and associated levels of taxation are making home ownership a necessity for households which are upwardly mobile in terms of income.

8. The large "baby boom" market born in the late 1950's to early 60's (ages 20 to 30) are now showing preference for home ownership. Households in this market are generally small and well suited for apartment living. Their incomes are being expanded by having two or more working members which makes homeownership accessible.

9. The rapidly increasing value of existing ownership housing in the County represents a major attraction to investors. These investors are reportedly playing a major role in the condo market by acquiring between 10% and 30% of converted units in a project and holding them for appreciation.

4. Developer means "any person ... who ... undertakes to develop a condominium project either by conversion to condominium status or construction of new buildings." Mont. Co. Code (1972, 1977 Repl. Vol.), § 11A-2 (9).

.

2. *Relocation cost.* Section 11A-5 (c) was added to the county code to provide that "[u]pon the involuntary termination of any tenancy which results from a condominium conversion, the developer or converter shall reimburse displaced tenants, determined to be in need of financial assistance under criteria established by County Executive regulation, the reasonable costs of relocation as determined under regulations issued by the County Executive up to a maximum obligation of $750."

3. *Moratorium on rental unit sales.* Bill 46-79 also added § 11A-5 (d) which reads:

> It shall be unlawful for a developer to enter into contracts for sale of any rental units proposed to be converted to condominium units which are part of a condominium project for which a property report . . . has not been filed . . . until such time as the horizontal property regime is created pursuant to State law. The provisions of this Section 11A-5 (d) shall cease to have any force and effect at 12:01 a.m. Saturday, November 10, 1979.

4. *Moratorium on conversions.* Subsection 11A-5 (d) was complementary to the moratorium on conversions provided in Bill 46-79, under which "no owner of a rental facility . . . shall issue a notice of intent to convert to a condominium" for a period of 120 days from July 13, 1979 at the end of which the moratorium expired.

Bill 46-79 was the subject of equity case 68203 (the "relocation cost case") brought in the court below on August 9, 1979 by certain of the appellants. These include Rockville Grosvenor, Inc., the owner of the Grosvenor Park Apartments containing about 1,000 rental units, and LaVay Rockcreek, Inc., the owner of the Rock Creek Garden Apartments containing about 500 rental units. These two owners had each filed pre-conversion property reports with the Office of Consumer Affairs and given to their tenants the notice of intention to create a condominium required by Md. Code (1974, 1980 Cum. Supp.), § 11-102.1 of the Real Property Article.

Trial of equity 68203 on August 22, 1979 was limited to the validity of the provision for reimbursement of relocation costs. This was because the plaintiffs desired an expedited hearing and decision on the reimbursement issue and because equity case 68354, described *infra,* had been filed on August 21, 1979, in which the remaining issues under Bill 46-79 would be decided. The trial court upheld the relocation cost reimbursement provisions of Bill 46-79 but found the regulation issued thereunder to be contrary to the local statute and void.

Six days after Bill 46-79 went into effect, *i.e.,* on July 26, 1979, the County Executive signed another emergency enactment, Bill 42-79. It provided for a right in certain organizations to purchase a rental facility which was to be sold. Both Bill 46-79 and Bill 42-79 were attacked in the second case in this appeal, Equity No. 68354 (the "first right to buy" case). In addition to the Apartment and Office Building Association, plaintiffs in that case included the owners of Georgian Woods Annex Apartments (371 units in Wheaton), Westchester West No. 2 Apartments (345 units in Wheaton), Randolph Square Apartments (120 units in Rockville), London Terrace Apartments (61 units in Silver Spring) and Georgian Towers Apartments (859 units in Silver Spring).

The lifetime of Bill 42-79 was only until September 19, 1979 when its provisions were repealed and re-enacted with amendments by another emergency local law, Bill 51-79. Equity 68354 came on for trial on September 19, 1979, the complaint was amended to include an attack on Bill 51-79 and the case was tried that same day.

Bill 51-79 amended § 11A-5C, Mont. Co. Code. There was a legislative finding in § 11A-5C (a) of public emergency resulting from the sudden increase of conversions of existing rental facilities to condominium projects. Section 11A-5C (b) (1) then provided:

> Prior to the transfer of title to any rental facility which contains five or more dwelling units made with intent to convert to condominium ... the

> owner of such facility shall give certain organizations . . . the right of first refusal to purchase the rental facility within a period of 120 days from the date of notice . . . on the same terms and conditions, and at the same purchase price, as contained in any contract or agreement to purchase pursuant to which said transfer of title is to be made . . . .

The organizations entitled to exercise the right are any "bona fide resident tenants' organizations representing a minimum of 15%, or five units, whichever is the greater number . . .", Montgomery County and Montgomery County Housing Opportunities Commission. § 11A-5C (b) (2). Prior to transfer of the facility organizations entitled to purchase are to be given written notice, including a copy of the contract between the owner and the proposed transferee. § 11A-5C (c). All transfers of rental facilities are deemed to be with intent to convert to condominium unless the contract purchaser files an affidavit with the Office of Consumer Affairs disclaiming intent to convert and does not, for two years after transfer of title, give tenants notice of intent to create a condominium under the Maryland HPA. The local statute declares that if the purchaser within that two year period gives notice of intent to convert, he "thereupon" holds title to the facility "in trust," subject to the right of first refusal of the specified organizations. If during that period the then owner gives notice to tenants of intent to convert, he is required to satisfy the requirements of § 11A-5C "as an owner and as a contract purchaser of a rental facility with a deemed contract of purchase with identical terms, conditions and purchase price as that contract of purchase by which the contract purchaser became owner of the rental facility." § 11A-5C (d). There are a number of exemptions provided, none of which would exclude a contract of purchase and sale between parties willing, but not compelled, to purchase or sell. Under § 11A-5C (g) (1) it is unlawful to transfer title to any rental facility or to offer or sell any condominium unit, except in compliance with the section. One who violates § 11A-5C is "liable for the payment to the

County of a civil penalty specified in Section 11A-7 [5] . . ." (§ 11A-5C (g) (2)) and is "guilty of a misdemeanor" which carries a fine of up to $1,000 or imprisonment of up to 6 months or both (§ 11A-5C (g) (3)). By § 11A-5C (g) (4) the "penalties and remedies provided in Section 11A-7 [6] [are] applicable to violations of [§ 11A-5C]."

Under Bill 51-79, "[a]ll contracts and agreements for purchase of a rental facility made with intent to convert, and title obtained pursuant thereto, shall be contingent upon

---

5. Mont. Co. Code (1972, 1977 Repl. Vol.), § 11A-7 in pertinent part provided:

(c) Whenever it is determined by the office of consumer affairs that there has been a violation of this chapter . . . that office is authorized, at its discretion to commence with one or more of the following procedures:

(1) Attempt to conciliate the matter by conference or otherwise and secure a written conciliation agreement; or

(2) Seek a written assurance of discontinuance which shall be signed by the developer and the director of the office of consumer affairs; or

(3) Issue appropriate cease and desist orders; or

(4) Refer the matter to the county attorney for injunctive or other appropriate legal action.

(d) Any person who violates any provision of this chapter . . . shall be liable for the payment to the county of a civil penalty, recoverable in a civil action, in the sum of not more than five hundred dollars for each such violation . . . .

(e) It shall be unlawful for any developer to offer for sale any condominium unit in any condominium unless such developer has first filed a property report with the county in accordance with the terms of this chapter. Any developer who violates this provision shall be guilty of a misdemeanor and upon conviction shall be subject to a fine of not more than one thousand dollars or imprisonment for a period of not more than six months, or both.

(f) In addition to any criminal or other penalty herein provided, injunctive or other appropriate action or proceeding to correct a violation of this chapter may be instituted by the county attorney's office and any court of competent jurisdiction may issue restraining orders, temporary or permanent injunctions or other appropriate forms of relief.

(g) Nothing herein shall prevent any person from exercising any right or seeking any remedy to which such person might otherwise be entitled or from filing an appropriate complaint with a court of law or equity.

Complaint, penalty and enforcement provisions are now found in § 11A-11 under Bill 92-79.

6. See footnote 5.

and subject to full compliance with the requirements of [§ 11A-5C]." § 11A-5C (b) (3).

Bill 51-79 expired by its terms on February 1, 1980.

By its final judgment entered December 21, 1979, in the first right to buy case and for the reasons set forth in a written opinion filed December 6, 1979, the trial court held the moratorium provisions of Bill 46-79 to be moot, but otherwise valid. It held the criminal provision of § 11A-5C (g) (3) of Bill 51-79 to be invalid because of the presumption in § 11A-5C (d) (1) under which all transfers of rental facilities containing 5 or more dwelling units are deemed transfers with intent to convert to condominium. In all other challenged respects the court below sustained the county council statutes.

## II

In this Court appellees move to dismiss three issues as moot. One involves the moratorium on rental unit sales which expired November 10, 1979. The second issue relates to the moratorium on conversions which expired 120 days after July 13, 1979. These two issues are moot.

Appellants urge that these issues are of manifest and imperative public concern, that failure to decide the issues will be adverse to the public interest, that they have acted diligently and aggressively to have the issues promptly determined, that the issues involved are likely to recur and that the same time constraints on obtaining a final adjudication are likely to occur in a case involving future prohibitions because near term expiration dates will likely be inserted in the statutes.[7] We do not believe that these two questions are questions which "may frequently recur." *Attorney General v. Anne Arundel County School Bus Contractors Association,* 286 Md. 324, 328, 407 A.2d 749,

---

7. Appellees contend that the provisions under which the prohibitions would self-destruct after 120 days were not intended to prevent effective judicial review but were intended solely to maintain the *status quo* while the County Council studied how it could most effectively and comprehensively address the perceived emergency.

752 (1979). More particularly, it cannot be said to be likely that these two prohibitions will frequently recur in the same form as expressed in the expired statutes on which we are asked to rule.

Appellees further suggest that all issues relating to the first right to buy provisions of Bill 51-79 are moot because that bill expired February 1, 1980. However, appellees acknowledge that the subject matter is addressed in subsequent local legislation. Bill 97-79, emergency legislation signed by the County Executive January 30, 1980, again amended Montgomery County Code, § 11A-5C which was first enacted by Bill 42-79 and amended by Bill 51-79. Then Bill 92-79, which was enacted and signed in February 1980 and which became effective as ordinary legislation May 26, 1980, re-enacted Chapter 11A of the Montgomery County Code. The right of first refusal is continued in Chapter 11A as § 11A-9. While the criminal sanction previously found in subsection (g) (3) has been eliminated, the substance of the provisions which were before the trial court remains in effect. Under these circumstances issues relating to the first right to buy are not moot. *Bladensburg v. Berg,* 216 Md. 292, 139 A.2d 703 (1958).

Thus, the issues presented which are justiciable involve the validity of relocation cost reimbursement, of the first right to buy, and of the 60 day filing requirement.

### III

Appellants claim and appellees deny that the provisions of the Montgomery County laws in issue here are void under Section 3 of Maryland Constitution, Article XI-A, the Home Rule Amendment, because these local laws conflict with a public general law, the HPA. Appellants and appellees find support in the same statutory provisions and legislative history for their opposite positions.

The current HPA was enacted by Chapter 641 of the Acts of 1974. It replaced a condominium statute enacted in 1963.

The 1974 Act was proposed to the General Assembly in a report, with comments on the proposed statutory sections, by the Condominium Revision Committee of the Real Property, Planning and Zoning Section of the Maryland State Bar Association. With respect to conversions to condominium, and on the subject of local enactments, the committee report observed as follows:

> Some jurisdictions are imposing heavy burdens on the developer who desires to convert. . . . The area of conversion of the form of ownership of an existing building involves significant social considerations and includes establishing a delicate balance between the rights of tenants under leases and the rights of owners of property to use the property in the manner they determine to be best, subject, obviously, to existing tenancies and other rights granted to third parties. Therefore, the Committee recommends that this entire subject be referred to a study commission; it supports House Joint Resolution No. 10.[8]
>
> . . . .
>
> The Committee cannot emphasize sufficiently the importance which it attributes to the General Assembly passing one statute that will govern condominiums in the entire State so that this important new phase of real estate development is not sectionalized on a county by county basis. See § 11-120. Some counties are using the popularity of the consumer's interest in condominiums to impose regulations that are different than the ones applicable to apartment buildings. There is no basis in reason or fact for such a distinction when it is remembered that a condominium is merely a different form of ownership of title to the same structure. For instance, the Committee does not believe a county should impose a more stringent fire rating

---

8. The Joint Resolution did not pass. The study group was to have reported to the General Assembly.

on the walls of a building merely because the unit owners *own* an interest in the units. Tenants burn just as rapidly as owners and a respectable argument can be made that a tenant, who has a lesser property and financial interest in the structure, should be protected by higher minimum requirements than an owner. If the fire rating is inadequate for a wall in a building that is inhabited, the building code should be amended to require an adequate rating for that building, without regard to the form of ownership of the occupied areas. [Emphasis in text.]

Critical here is § 11-120 of the Real Property Article which has remained unchanged since 1974 and which reads:

§ 11-120. Zoning and building regulations.

(a) Except as otherwise provided in this title, the provisions of all laws, ordinances, and regulations concerning building or zoning shall have full force and effect to the extent that they apply to property ˉvhich is subjected to a condominium regime and shall be construed and applied with reference to the overall nature and use of the property without regard to the form of ownership. No law, ordinance, or regulation may establish any requirement or standard governing the use, location, placement or construction of any land and improvements which are submitted to the provisions of this title, unless the requirement or standard is uniformly applicable to all land and improvements of the same kind or character not submitted to the provisions of this title.

(b) No county, city, or other jurisdiction may enact any law, ordinance, or regulation which would impose a burden or restriction on a condominium that is not imposed on all other property of similar character not subjected to a condominium regime. Any such law, ordinance, or regulation, is void.

Accompanying this section is a committee comment. It states:

> Subsection 11-120(a) is derived in part from § 11-125 of the 1972 version of this Title. The last sentence of subsection 11-120(a) and subsection 11-120(b) constrain the adoption of local laws, etc., which apply different land use standards, building code requirements and the like to condominiums than would be applied to other property substantially similar in character not submitted to the provisions of this Title. The Committee firmly concluded that "condominium" is a matter of title (i.e., a form of ownership) and not a matter of land use or zoning. These provisions are substantially the same as those adopted in several other jurisdictions (e.g., Chapter 711.21, Florida Statutes) and the matter treated in this section has already been litigated in other jurisdictions. Bridge Park Co. v. Borough of Highland Park, 113 N.J. Super. 219, 273 A.2d 397 (1971); Maplewood Village Tenants Association v. Maplewood Village, 116 N.J. Super. 372, 282 A.2d 428 (1971).

Also relevant is § 11-127 of the Real Property Article which provides:

> § 11-127. Title additional and supplemental.
>
> (a) The provisions of this title are in addition and supplemental to all other provisions of the public general laws, the public local laws, and any local enactment in the State.
>
> (b) If the words, "single family residential unit," "property," "blocks," or other designation denoting a unit of land, appear in the Code, the public local laws, or any local enactment, a reference to a condominium unit or regime, whichever is appropriate, is deemed inserted after these descriptive terms where appropriate to implement this title.

(c) If the application of the provisions of this title conflict with the application of other provisions of the public general laws, public local laws, or any local enactment, in the State, the provisions of this title shall prevail.

The trial court held that the prohibitions of § 11-120 relate only to those local laws which concern matters of land use, zoning or building code requirements and do not prohibit the economic regulations presented here. To reach that conclusion one must necessarily read into the scope of the prohibition in § 11-120 (b) the limitation expressed in § 11-120 (a) as if § 11-120 (b) stated that "[n]o county . . . may enact any law . . . [concerning building or zoning] which would impose a burden or restriction on a condominium that is not imposed on all other property of similar character not subjected to a condominium regime." Such a reading, however, presents a number of difficulties. The prohibition of § 11-120 (b) is in terms unqualified either as to the type of law or as to the purpose of the law to which the prohibition is addressed. The only criterion in subsection (b) for identifying a law proscribed by it is the impact of that law, by way of burden or restriction on a condominium, as compared to its impact, or lack thereof, on similar property. Further, were the laws addressed in subsection (b) impliedly limited to laws "concerning building or zoning," or impliedly limited to laws "governing the use, location, placement or construction" of condominiums, as expressed in subsection (a), then subsection (b) is rendered surplusage. A law concerning building or zoning, or one governing use, location, placement or construction, which would impose a burden or restriction on a condominium which is not imposed on all other property of similar character in violation of subsection (b) is a law whose requirement is not "uniformly applicable to all land and improvements" whether or not submitted to the HPA, and would violate subsection (a).

In the context of the property tax assessment provisions of the original HPA, we reiterated the general rule of statutory construction that, absent clear indication to the contrary

and if reasonably possible, "a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless, or nugatory." *Supervisor of Assessments of Anne Arundel County v. Southgate Harbor,* 279 Md. 586, 590, 369 A.2d 1053, 1055 (1977). *A fortiori,* the rule applies to subsections.

Appellees rely most heavily on the committee comment to § 11-120 to support a limited interpretation of the entire section. Particular emphasis is placed on the statement that the "last sentence of subsection 11-120 (a) and subsection 11-120 (b) constrain the adoption of local laws, etc., which apply different land use standards, building code requirements and the like to condominiums . . . ." The two decisions in New Jersey which are referred to in the comment involved land use and zoning.[9]

While the discussion in the committee comment which accompanies § 11-120 is limited to the planning, zoning and building areas, we fail to see how subsection 11-120 (b)'s unqualified reference to "any law" is thereby restricted. The comment does not suggest that its illustrations exhaust the intended scope of § 11-120. To the contrary, it states that the laws constrained are different land use standards, building code requirements "and the like . . . ." Moreover, the committee, in its report to the General Assembly, makes clear a policy objective which is broader than prohibiting zoning and building laws which discriminate against condominiums. By reference to § 11-120 the committee said it "cannot emphasize sufficiently the importance which it attributes to the General Assembly passing one statute that will govern condominiums in the entire State so that this important new phase of real estate development is not

---

**9.** Bridge Park Co. v. Borough of Highland Park, 113 N.J. Super. 219, 273 A.2d 397 (1971) held there was no power granted to a municipality under the state zoning enabling act to regulate ownership of buildings and that conversion to condominium was a matter of ownership and not of physical use. Maplewood Village Tenants Association v. Maplewood Village, 116 N.J. Super. 372, 282 A.2d 428 (1971) recognizes that a municipality could not require subdivision approval for the conversion to condominium of an apartment house which conformed to the town zoning because the state statute required that zoning laws be applied based on the nature and use of a condominium without regard to the form of ownership.

sectionalized on a county by county basis." It is this broader
objective which is addressed in subsection 11-120 (b).

Section 11-120 can best be interpreted and harmonized
with the legislative history by reversing the order in which
the concepts are presented in the section. The general rule
is stated in subsection (b). It is that no county may enact any
law which would impose a different burden or restriction on
a condominium. This prohibition is unlimited and includes
building and zoning laws. A special rule is stated in
subsection (a). To the extent that laws concerning building
and zoning apply to property which is subjected to a
condominium regime, such laws have full force and effect,
but they are subject to the rule of interpretation for
condominiums under which they are "construed and applied
with reference to the overall nature and use of the property
without regard to the form of ownership." The second sen-
tence of subsection (a) draws the outer perimeter of the
application, under the special interpretation, of zoning and
building laws to condominiums by then applying the same
policy as found in the general rule of subsection (b). A law
"governing the use, location, placement or construction of
any land and improvements" is not to be applied to a
condominium, even looking to its overall nature and use, if
the law's "requirement or standard" is not uniformly
applicable to all land and improvements of the same kind or
character, whether or not submitted to the HPA.

This interpretation of the relationship between the two
subsections of § 11-120 is reinforced by reference to Florida
Statutes Ann. § 711.21 (West 1969) (now Fla. Stat. Ann.
§ 718.507 (West 1976, 1980 Supp.)) which the committee
comment describes as being "substantially the same" as
those provisions of § 11-120 which are described in the
comment. In the comparison below, the text of the Florida
statute is in regular case, Maryland deletions from it are
bracketed and Maryland additions are italicized.

> *Except as otherwise provided in this title, the
> provisions of* [All] *all* laws, ordinances and
> regulations concerning building[s] or zoning shall

*have full force and effect to the extent that they apply to property which is subjected to a condominium regime and shall* be construed and applied with reference to the *overall* nature and use of [such] *the* property without regard to the form of ownership. No law, ordinance or regulation [shall] *may* establish any requirement [concerning] *or standard governing* the use [or] *,* location, placement or construction of [buildings or other] *any land and* improvements which are [, or may thereafter be subjected to the condominium form of ownership,] *submitted to the provisions of this title,* unless [such] *the* requirement *or standard* [shall be equally] *is uniformly* applicable to all [buildings] *land* and improvements of the same kind *or character* not [then or thereafter to be subjected to the condominium form of ownership.] *submitted to the provisions of this title.*

It is apparent that the concept in Maryland § 11-120 (a) which has no counterpart at all in the Florida version is the express recognition of force and effect to building and zoning laws. This express recognition in § 11-120 (a) is dictated by the presence of the general prohibition against different burdens of any type on condominiums in § 11-120 (b) which is absent from the Florida statute. To guard against the possible voiding of building and zoning laws on a *prima facie* basis under the test set forth in subsection (b), such laws are expressly preserved and subjected to the special rule for interpretation before testing for validity under the test of subsection (a).

Much the same philosophy is embodied in § 11-127 of the Real Property Article which we here discuss only with respect to its effect on local laws. Because only those local laws which adversely affect condominiums differently than other similar property are voided by § 11-120 of the HPA, there are conceivably many non-discriminatory local laws which could apply to condominiums. It is with reference to such non-discriminatory local laws that the HPA speaks when stating that it is "in addition and supplemental to all

other provisions of . . . any local enactment in the State." § 11-127 (a). This provision also negates any intent of the General Assembly completely and exclusively to occupy the field of legislation with respect to condominiums. We therefore reject appellants' contention that the HPA has resulted in a total preemption of the subject matter, similar to state preemption of the assessment of real property for property taxes, *Montgomery County Board of Realtors, Inc. v. Montgomery County,* 287 Md. 101, 411 A.2d 97 (1980), of education, *McCarthy v. Board of Education of Anne Arundel County,* 280 Md. 634, 374 A.2d 1135 (1977) and of election campaign financing regulation, *County Council for Montgomery County v. Montgomery Ass'n,* 274 Md. 52, 333 A.2d 596 (1975).

Because the variety of non-discriminatory local laws for their particular purposes may denote a unit of land without reference to the condominium form of ownership and because the HPA is superimposed on a body of existing statutory law, § 11-127 (b) of the HPA deems inserted in such laws "where appropriate to implement" the HPA, a "reference to a condominium unit or regime." In the event of conflict in the application of the provisions of the HPA with the application of the provisions of local law, the HPA prevails. § 11-127 (c).

We shall now consider whether a conflict exists between the HPA and the provisions of the Montgomery County laws which remain as issues.

## IV

The obligation imposed by Montgomery County local law on the developer or converter to reimburse displaced tenants for up to $750 of the reasonable cost of relocation is triggered by "the involuntary termination of any tenancy which results from a condominium conversion . . . ." [10]

---

10. The provision which was first enacted by Bill 37-79 as Mont. Co. Code, § 11A-5 (c) has been re-enacted *in haec verba* by Bill 92-79 as Mont. Co. Code, § 11A-7 (c).

"Conversion" means "the offering for sale by a developer ... of condominium units that were previously rental units." Mont. Co. Code (1972, 1977 Repl. Vol.), § 11A-2 (8). "Offering" is a definitional term which means "any inducement ... or announcement to the general public to encourage a person to acquire a condominium unit in a condominium." Mont. Co. Code, § 11A-2 (10). "Condominium," in turn, means "property subject to the condominium regime established pursuant to the Horizontal Property Act of the state." Mont. Co. Code, § 11A-2 (5). This is essentially the definition in HPA, § 11-101 (d). Under the HPA, § 11-102 (a) of the Real Property Article, "[t]he owner of any property in the State may subject the property to a condominium regime by recording among the land records of the county where the property is located, a declaration, bylaws, and condominium plat that comply with the requirements specified in" the HPA.

State law provides that each tenant occupying as his residence any portion of property which is to be subjected to a condominium regime shall be given notice of intention to create a condominium at least 180 days before the property is subjected to a condominium regime.[11] HPA, § 11-102.1 (a). A residential tenant whose lease would ordinarily terminate during the 180 day period is entitled to have the term extended until the expiration of the 180 day period. HPA, § 11-102.1 (d). No residential tenant in Montgomery County may be subjected to an "involuntary termination" of the tenancy until the time when the property may be converted to condominium by the recordation of the required documents. Thus the burden of the Montgomery County relocation cost reimbursement law is a burden on a condominium.

Tenant relocation cost reimbursement under the Montgomery County law applies only to those involuntary terminations which result "from a condominium conversion

_____

11. Whether the 180 day period is extended by local law in Montgomery County is discussed *infra*. Its determination is irrelevant to the present issue.

. . . ." No relocation reimbursement is required if the owner of an apartment house or apartment complex refuses to renew leases of tenants who desire to continue to rent, because the owner plans to convert the facility to a cooperative apartment and sell the rights to occupy the apartment units. Nor does relocation reimbursement apply to involuntary termination resulting from a plan to raze a rental facility and convert to business or commercial use. The relocation reimbursement provisions now codified as Mont. Co. Code, § 11A-7 (c) "impose a burden on a condominium that is not imposed on all other property of similar character not subject to a condominium regime" and are void by virtue of the limitation on the exercise of local legislative power imposed by HPA, § 11-120 (b).

It should be emphasized that we do not reach the question of whether a charter county, if free of the restriction of § 11-120 (b), could validly legislate in the manner presented here, in response to a combination of circumstances which are peculiar to that county.

## V

The provisions for a first right to buy in certain organizations which are now Mont. Co. Code, § 11A-9 come into play when a contract is made by the owner of a rental facility to sell the property to a buyer who intends to convert the property to condominium. One of appellants' assertions is that the first right to buy law violates Md. Const. art. XI-A, § 3 because of conflict with provisions of the HPA other than § 11-120 (b).[12] It is contended that persons seeking to convert to condominium pursuant to state law may be prevented from so doing by being deprived of the property by forced sale to another party. Because there are apartment owner appellants in the first right to buy case whose stipulated testimony was that they were restricted by the local law in contracting to sell their rental facilities, they

---

12. Because we decide that there is prohibited conflict with HPA, § 11-102 (a), it is unnecessary to address appellee's contention that the first right to buy law is not in conflict with HPA, § 11-120.

have standing to raise the issue. *Cf. Singleton v. Wulff,* 428 U.S. 106, 112-13, 96 S. Ct. 2868, 2873-74, 49 L. Ed. 2d 826, 832 (1976) (Physicians who would be denied reimbursement for performing medicaid funded abortions suffer injury-in-fact and thus have standing to challenge state statute excluding benefits for abortions not "medically indicated.")

Under the scheme of the first right to buy law, as set forth in Bill 51-79, if the contract purchaser acknowledges the intent to convert and gives notice before transfer of title, one of the designated organizations may buy and the contract purchaser will not acquire the property and accomplish the conversion. If the contract purchaser files an affidavit under § 11A-5C (d) (1) disclaiming intent to convert, the transfer may proceed without complying with the notice of first refusal rights. If the affidavit is false and the contract to purchase was made with intent to convert then § 11A-5C (b) (3) says that the contract "and title obtained pursuant thereto, shall be contingent upon and subject to full compliance with the requirements" of the first right to buy law. If, within two years after transfer, the transferee decides to convert (or first manifests by notice a previously undisclosed intent to convert), the specified organizations may exercise the first right to buy and the conversion by the transferee owner may be prevented.

The principle for determining the existence of the type of conflict which would void a local law under Md. Const. art. XI-A, § 3 is set forth in *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 317, 255 A.2d 376, 382 (1969). We said:

> A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted. Stated another way, unless a general public law contains an express denial of the right to act by local authority, the State's prohibition of certain activity in a field does not impliedly guarantee that all other activity

shall be free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation. [Emphasis in text.]

*Sitnick & Firey* sustained a higher minimum wage rate under a Baltimore City ordinance than was required under the State minimum wage law. The principle is also illustrated by its applications to features of the Montgomery County landlord-tenant relations law which was before this Court in *County Council for Montgomery County v. Investors Funding Corporation,* 270 Md. 403, 312 A.2d 225 (1973). The public general law permitted summary eviction while the local law made it unlawful to evict if the landlord-tenant commission established under the local law found that the eviction was in retaliation for the tenant's exercise of a legal right. That feature of the local law was void. Similarly, oral leases which were both recognized and permitted by public general law were not permitted under the local law which required all leases to be in writing, so that those local provisions were void. However, a requirement for minimum lease terms of two years and a prohibition against confessed judgment for rent due were each valid since the public general laws merely recognized the existence at common law of tenancies for lesser terms and of confessed judgments, but the public general laws did not expressly permit them. In *Heubeck v. City of Baltimore,* 205 Md. 203, 107 A.2d 99 (1954), a rent control ordinance in Baltimore City was held to be invalid because it proscribed the eviction of tenants from controlled housing accommodations after the expiration of the lease term in the face of the public general law which permitted eviction upon expiration of a lease.

There is clear conflict in the instant matter. Section 11-102 (a) expressly permits the "owner of any property in the State [to] subject the property to a condominium regime" by recording a declaration, bylaws and plat. Under the Montgomery County law the owner by transfer is prohibited for a period of two years from subjecting the property to a condominium regime as allowed by state law. That

transferee must first offer the property to third parties, any one of whom may defeat the conversion by compelling sale to it. If the owner does not comply with the local law he is at a minimum subject to civil penalty, injunction and, under the theory of the local law, an action to enforce the trust which the statute undertakes to impose upon the owner.

The application of the first right to buy law to a sale and purchase, with intent to convert, in the interval between contract and transfer of title also violates Md. Const. art. XI-A, § 3 even though during that period the property is not a condominium under the definition in HPA, § 11-101 (d), and even though the contract purchaser is not yet an "owner" of the property as that term is used in HPA, § 11-102 (a). There is constitutionally prohibited conflict where the *effect* of the local law is to prohibit that which the public general law expressly permits. For example, the "Real Property Recapture Tax" imposed by local law which was involved in *Montgomery County Board of Realtors, Inc. v. Montgomery County, supra,* sought to impose " 'upon the occasion of the transfer of real property . . . a tax on the amount by which the taxable value of such property on the date of recognition exceeds the assessed valuation of the property.' " *Id.* at 103, 411 A.2d at 98. "Despite the wording of the statute, its effect [was] to move forward the date of finality as to sales made after that date." *Id.* at 110, 411 A.2d at 101-102. Based on this conflicting effect, and on the conflict of the recapture tax with public general laws relating to allegedly erroneous assessments, we held the recapture tax to be void. Similarly, the provisions of local law concerning retaliatory evictions presented in *County Council for Montgomery County v. Investors Funding Corporation, supra,* did not in terms attempt directly to prohibit evictions permitted by public general law from taking effect. The local law required the landlord to covenant in the lease that no retaliatory action would be taken against a tenant who attempted to enforce his rights. However, if a landlord effected an eviction, and, upon complaint by the tenant to the Commission for landlord-tenant relations created by the local law, it were

determined that the eviction was retaliatory, the landlord was subject to administrative and, ultimately, criminal sanctions. In that case we were not persuaded to alter the conclusion that the local law conflicted with public general law relating to summary evictions "by the fact that the prohibition of [local law] operate[d] indirectly and circuitously." *Id.* at 423, 312 A.2d at 236.

In the instant matter the first right of refusal operates to allow forced sale of a rental facility as soon as a contract purchaser of such a facility manifests an intent to convert to condominium. Thus, if the right to buy under the first refusal law is exercised, the effect is to prevent the contract purchaser from obtaining title and ever fulfilling the intent to convert the property. The first refusal law operates even more directly to prohibit that which is expressly permitted by state law than did the sanctions for retaliatory evictions invalidated in *Investors Funding.* We therefore hold the first right of refusal law to be invalid.

## VI

The 60 day filing provision arises under Bill 46-79 by which Montgomery County Code, § 11A-4 (a) provided in part that a developer "shall not enter into a binding contract . . . for the sale of any condominium unit . . . unless . . . [a] copy of a property report . . . is filed with the . . . Office of Consumer Affairs at least sixty days prior to the first offering or at least sixty days prior to the notice of conversion to tenants." We assume the correctness of appellants' interpretation that the provision for filing 60 days prior to the notice of conversion is the alternative exclusively applicable in situations involving conversion of an existing rental facility.[13] The most closely related provision of the HPA is § 11-102.1 (a) which provides that "[a]t least 180 days before property is subjected to a condominium regime

---

13. As repealed and re-enacted by Bill 92-79, Mont. Co. Code, § 11A-4 (a) prohibits condominium unit sales unless a copy of a property report is filed "at least sixty days prior to the first offering and, in the case of conversions, at least sixty days prior to the notice of conversion to tenants."

. . ." the owner shall give to residential tenants a notice of intention to create a condominium. HPA § 11-120 is not impinged because the property is not a condominium when the 60 day filing provision is triggered. The 60 day requirement postpones by that number of days the time at which a notice of intention to create a condominium may first be given under state law but does not, on its face, have the effect of preventing conversion under HPA § 11-102 (a). The 60 day filing requirement is companion to another provision of local law which requires that "[a]t the time of receiving of notice of conversion, tenants shall be provided with a property report . . . ." Mont. Co, Code, § 11A-5 (a), as re-enacted with amendments by Bill 46-79.[14]

No contention is presented that there is any conflict in the required content of the property report which is to be filed under local law and the provisions of the HPA, including the content of the notice of intention to create a condominium under § 11-102.1 thereof. Appellants' argument is that the restriction on the privilege of creating a condominium regime imposed by the 60 day requirement conflicts with the HPA because it prohibits a property owner from creating a condominium regime at such time as he may select. We hold that there is no prohibited conflict. The local law does not prohibit that which is *expressly* permitted by public general law. Section 11-102.1 of the HPA merely measures back in time from the filing of the documents which create a condominium regime the minimum period of notice which residential tenants are required to receive before conversion. The HPA does not fix an event or combination of circumstances as the beginning of a specific period of time after which conversion may be accomplished as a matter of state law right. Indeed, the thrust of HPA, § 11-102.1 is to confer protections on residential tenants. It operates to restrict the rights of owners. The State's prohibition of effecting conversion during the minimum 180 day period "does not impliedly guarantee that all other activity shall be

14. Under Bill 92-79 the identical provision is Mont. Co. Code, § 11A-7 (a).

free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation." *City of Baltimore v. Sitnick & Firey, supra,* 254 Md. at 317, 255 A.2d at 382.

Appellants further contend that the 60 day requirement imposes an unconstitutional restriction on the use of property in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and in violation of Article 24 of the Maryland Declaration of Rights. They refer to an opinion in the Circuit Court for Montgomery County [15] which invalidated Mont. Co. Code, § 11A-4 (a) as originally enacted by 1974 Laws of Montgomery County, ch. 58. At that time the property report was to be filed at least 10 days prior to the notice of conversion. The ground of the trial court decision on this point was that the ordinance failed to limit the time within which the Office of Consumer Affairs was to complete its review of the property report and this was held to constitute an unreasonable restraint on alienation. While Bill 46-79, which was before the trial court on this appeal, contained no limit on the period of review, this feature of appellants' argument has been rendered moot by Bill 92-79 which does impose time limits on the administrative review.[16]

---

**15.** Freeman & Associates v. Montgomery County, Equity No. 50058, decided November 22, 1974.

**16.** Under Bill 92-79, Mont. Co. Code, § 11A-4 (a) (1) (d) provides:

> The Office of Consumer Affairs shall review the property report for compliance with Section 11A-3 and shall within 60 days either accept the report or reject it and notify the developer or agent of its decision. If the Office of Consumer Affairs does not act within 60 days of filing, the property report shall be deemed accepted. The Office of Consumer Affairs shall communicate with the developer or agent, within thirty days of receipt of the filing, any requests for additional information or to identify any deficiencies in the report. If the report is rejected, the Office of Consumer Affairs shall specify the reasons and the information which the Office of Consumer Affairs views as necessary to a full and complete disclosure as contemplated by Section 11A-3. A property report which has been rejected may be resubmitted with amendments, and the Office of Consumer Affairs shall review it and notify the developer or agent of acceptance or rejection within 30 days. If the Office of Consumer Affairs does not so notify the developer within 30 days, the amended report shall be deemed to have been accepted.

This provision is not before us and we express no opinion on its effect.

The combination of the 180 day notice period under state law with the 60 day filing period under local law, for an effective waiting period of at least 240 days before property may be subjected to a condominium regime, does not offend due process. In *Westchester West No. 2 Limited Partnership v. Montgomery County,* 276 Md. 448, 454-55, 348 A.2d 856, 860 (1975) we sustained the Montgomery County rent control ordinance and said:

> This Court has pointed out on numerous occasions that the test for constitutionality of regulatory legislation under the Due Process Clause is whether the statute, as an exercise of the state's police power, "bear[s] a real and substantial relation to the public health, morals, safety and welfare of the citizens of the State." [cit. om.] However, in applying this test the courts perform a very limited function. Unless the exercise of the police power by the Legislature is shown to be arbitrary, oppressive or unreasonable, the courts will not interfere with it. [cit. om.] Moreover, the wisdom or expediency of a law adopted in the exercise of the police power of a state is not subject to judicial review, and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported.

The 60 day requirement is reasonably related both to the consumer protection objective of the property report and to the public welfare objective of minimizing the impact of residential lease terminations resulting from condominium conversions by providing time additional to that provided under state law within which tenants who will be dislocated may find substitute housing once the owner's intent to convert is manifested by the filing of the property report with the Office of Consumer Affairs.

Testimony before the Montgomery County Council, the Report of the Cooperative Group on Condominium Conversions and the legislative findings of the Montgomery County Council embodied in the series of condominium bills

enacted in the summer of 1979 reflect far more than the reasonable possibility that a state of facts existed which would sustain the classification involved in the 60 day filing requirement, so that no violation of equal protection is presented here.

We also reject appellants' contention that Bill 46-79 was not in fact a valid emergency bill. A legislative determination of emergency is conclusive and not reviewable. *E.g., Biggs v. Maryland-National Capital Park and Planning Commission,* 269 Md. 352, 306 A.2d 220 (1973).

The 60 day filing requirement of Bill 46-79 is severable from the provision for reimbursement of relocation expense which was enacted as part of that same bill. In light of the intensive efforts by the County Executive, the County Council, and administrative agencies of Montgomery County, as well as by groups in the private sector, directed toward preserving the rental stock of the county and ameliorating dislocations resulting from condominium conversions, we are completely satisfied that the 60 day filing requirement would have been enacted had the County Council known that the relocation expense reimbursement provisions of Bill 46-79 were invalid. *Baltimore City v. Stuyvesant Insurance Co.,* 226 Md. 379, 174 A.2d 153 (1961).

## VII

For the foregoing reasons we hold the following provisions of the Montgomery County Code to be invalid:

1. The relocation cost reimbursement provisions of § 11A-5 (c), enacted by Bill 37-79, and re-enacted by Bills 46-79 and 92-79 and now codified as § 11A-7 (c).
2. The right of first refusal provisions enacted as § 11A-5C by Bill 42-79, repealed and re-enacted with amendments by Bills 51-79, 97-79 and 92-79 and now codified as § 11A-9.

The 60 day filing requirement enacted as § 11A-4 (a) by Bill 46-79, repealed and re-enacted with amendments by Bill 92-79 and now codified as § 11A-4 (a) (1), is valid.

> *Judgment in Equity No. 68203 reversed.*
>
> *Judgment in Equity No. 68354 affirmed in part and reversed in part.*
>
> *The cases are remanded to the Circuit Court for Montgomery County for the entry of decrees consistent with this opinion.*
>
> *Costs to be paid one-half by appellants and one-half by appellees.*

*Davidson, J., concurring in part and dissenting in part:*

I agree with the majority's holding that the 60 day filing provision of Montgomery County Code [M.C. Code] § 11A-4 (a) (now § 11A-4 (a) (1)) is valid. With respect to the right of first refusal provisions of M.C. Code § 11A-5C (now § 11A-9), I further agree with the majority's holding that M.C. Code § 11A-5C (d) (2) is invalid. To this extent, I concur in the majority's result.

I do not agree, however, with the majority's holding that the remaining right of first refusal provisions of M.C. Code § 11A-5C are invalid. Nor do I agree with the majority's holding that the relocation cost reimbursement provision of M.C. Code § 11A-5 (c) (now § 11A-7 (c)) is invalid. To this extent, I respectfully dissent. Accordingly, I would hold the remaining right of first refusal provisions of M.C. Code § 11A-5C and the relocation cost reimbursement provision of M.C. Code § 11A-5 (c) to be valid.[1]

---

1. In order for me to conclude that these provisions are valid, it was necessary for me to consider issues raised and decided in the trial court that were not reached by the majority. Suffice it to say that I have considered each of these issues in determining that these provisions are valid.

## I

### Right of First Refusal Provisions

The relevant statutory sections here are Md. Code (1974, 1980 Cum. Supp.), § 11-102 (a) of the Real Property Article [Md. Code § 11-102 (a)] and M.C. Code §§ 11A-5C (b) (1), 11A-5C (d), 11A-5C (g) and 11A-7 of the Condominium Chapter.

Maryland Code § 11-102 Establishment of [C]ondominium [R]egime provides in pertinent part:

> "(a) By recording declaration, bylaws and plat. — The *owner* of any property in the State may subject the property to a condominium regime by recording among the land records of the county where the property is located, a declaration, bylaws, and condominium plat that comply with the requirements specified in this title." (Emphasis added.)

Montgomery County Code § 11A-5C (b) (1) (now § 11A-9 (b) (1)) provides in pertinent part:

> "(b) *Transfers* with Intent to Convert to Condominium.
>
> (1) Prior to the *transfer of title* to any rental facility which contains five or more dwelling units made with intent to convert to condominium as defined in this Section, the owner of such facility shall give certain organizations designated herein the right of first refusal to purchase the rental facility within a period of 120 days from the date of notice as provided herein, on the same terms and conditions, and at the same purchase price, as contained in any contract or agreement to purchase pursuant to which said transfer of title is to be made, or on other mutually agreeable terms and conditions." (Emphasis added.)

Montgomery County Code § 11A-5C (d) (now § 11A-9 (d)) provides in pertinent part:

"(d) Intent to Convert to Condominium.

(1) *All transfers* of rental facilities which contain five or more dwelling units shall be deemed to be transferred with intent to convert to condominium and subject to the requirements of this Section, unless the following requirements are met:

a. The contract purchaser, within thirty days prior to the transfer, files an affidavit with the Director of the Office of Consumer Affairs stating that the transfer is not made with intent to convert to condominium. . . .

b. The contract purchaser does not, within two years from the date of transfer of title, give tenants notice of intention to create a condominium. . . .

(2) Compliance with the affidavit requirement of subsection 11A-5C (d) (1) a. shall be sufficient *to permit the transfer of title to the contract purchaser* without further compliance with the requirements of this Section; however, upon the giving of notice of intention to create a condominium within the time limit set forth in subsection 11A-5C (d) (1) b., *the contract purchaser who is then an owner of the rental facility by the passage of title thereto,* shall thereupon hold the title in trust subject to the right of first refusal of the organizations specified herein to purchase the rental facility and shall be required to satisfy the requirements of this Section as an owner and as a contract purchaser of a rental facility with a deemed contract of purchase with identical terms, conditions and purchase price as that contract of purchase by which the contract purchaser became owner of the rental facility." (Emphasis added.)

Montgomery County Code § 11A-5C (g) (now § 11A-9 (g)) provides in pertinent part:

"(g) Penalties for Violation of Section.

. . .

(2) Any person who violates any provision of this Section shall be liable for the payment to the County of a civil penalty as specified in Section 11A-7; each such transfer of title to any rental facility and each sale of a condominium unit within a condominium project in violation of the requirements of this Section shall constitute a separate offense."

Montgomery County Code § 11A-7 (d) (now § 11A-11 (d)) provides in pertinent part:

"(d) Any person who violates any provision of this Chapter . . . shall be liable for the payment to the County of a civil penalty, recoverable in a civil action, in the sum of not more than five hundred dollars for each such violation."

Maryland Code § 11-102 (a) gives the owner of property the right to establish a condominium regime by recording a declaration, bylaws, and plat. In my view, nothing in M.C. Code § 11A-5C (a), (b), (c), (d) (1), (e), (f) and (g) prevents an owner of property in Montgomery County from establishing a condominium regime pursuant to Md. Code § 11-102 (a).

All of these provisions establish a statutory scheme designed to regulate the circumstances under which property may be transferred by an owner who elects to sell his property rather than to establish a condominium regime. More particularly, the statutory scheme delineates the circumstances under which an owner of a rental facility must offer a right of first refusal to tenants before title may be transferred to a contract purchaser. None of these provisions is designed to impose any procedures or requirements upon an owner who elects to establish a condominium regime.

Montgomery County Code § 11A-5C (b) (1) concerns transfers by an owner to a contract purchaser who intends to

convert to condominium. That section, in essence, prohibits an owner from transferring title to a rental facility to a purchaser who intends to convert to condominium without giving tenants the right of first refusal.

Montgomery County Code § 11A-5C (d) concerns transfers by an owner to a contract purchaser who does not intend to convert to condominium. Montgomery County Code § 11A-5C (d) (1) creates a presumption that all transfers of rental facilities are made with the intent to convert. Montgomery County Code § 11A-5C (d) (1) a. and b. establish a mechanism by which that presumption may be rebutted. Those subsections, when read in the context of M.C. Code § 11A-5C (b), establish that an owner may transfer a rental facility without offering the right of first refusal if the purchaser files an affidavit stating that he does not intend to convert to condominium and that purchaser does not give notice of an intention to convert within two years. These provisions make it possible for an owner to transfer a rental facility without offering the right of first refusal when a purchaser has no actual intent to convert to condominium but intends, in fact, to retain the building as a rental facility.

There is nothing in the language of M.C. Code § 11A-5C (b) and (d) (1) a. and b. that prohibits that which is expressly permitted by Md. Code § 11-102 (a). Montgomery County Code § 11A-5C (b) and (d) (1) a. and b. are nothing more than provisions that govern transfer of rental facilities. They do nothing more than delineate the circumstances under which rental facilities may be transferred with or without offering the right of first refusal. Consequently, these provisions apply only to owners who elect to transfer a rental facility to a contract purchaser; they do not apply to owners who elect to convert to condominium. Thus, although these provisions may affect an owner's right to transfer his property, because they do not interfere with his right to convert to condominium, they do not, in my view, prohibit an owner of property in Montgomery County from establishing a condominium regime pursuant to Md. Code § 11-102 (a).

Moreover, in my view, M.C. Code § 11A-5C (b) and (d) (1) a. and b. do not have the practical effect of prohibiting that

which is expressly permitted by Md. Code § 11-102 (a). With respect to M.C. Code § 11A-5C (b), I recognize that under certain circumstances, as the majority points out, that subsection may result in a "forced sale" and may, therefore, prevent a contract purchaser from establishing a condominium regime. Because, in my view, M.C. Code § 11A-5C (b) (1) has a practical effect only on contract purchasers, it is not in conflict with Md. Code § 11-102 (a) because Md. Code § 11-102 (a) does not give a contract purchaser the right to establish a condominium regime. What the majority overlooks is that Md. Code § 11-102 (a) gives that right only to owners of property.

I reach the same conclusion with respect to M.C. Code § 11A-5C (d) (1) a. and b. The manifest purpose of these subsections is to make it possible for an owner to transfer a rental facility without offering the right of first refusal when he has no intention to convert within two years of transfer of title. Thus, these subsections provide a mechanism for a purchaser who wants to buy and maintain a rental facility to purchase that facility without the delay or risk created by right of first refusal provisions. I cannot comprehend how a law that enables a purchaser to buy a rental facility without imposing a right of first refusal requirement has the practical effect of preventing that purchaser from creating a condominium regime. Moreover, even if M.C. Code § 11A-5C (d) (1) a. and b. had such an effect, it would not conflict with Md. Code § 11-102 (a) because Md. Code § 11-102 (a) does not give a contract purchaser the right to establish a condominium regime.

In my view, there is nothing in the plain language or practical effect of M.C. Code § 11A-5C (b) and (d) (1) a. and b. that conflicts with Md. Code § 11-102 (a). Accordingly, I would hold these subsections to be valid.

Montgomery County Code § 11A-5C (d) (2) concerns procedures to be followed by a contract purchaser who has become an owner of a rental facility after swearing in an affidavit that he had no intention to convert to condominium but who nonetheless gives notice of such an intention within

two years of the date of transfer of title. That subsection embodies that portion of the statutory scheme designed to protect the rights of tenants under such circumstances by requiring that the owner must offer a right of first refusal when he gives notice of his intention to convert to condominium. Because this provision requires an owner to give a right of first refusal before he may establish a condominium regime, it is in conflict with Md. Code § 11-102 (a) which permits an owner to establish a condominium regime by doing nothing other than recording a declaration, bylaws, and plat. It is for this reason that I agree with the majority's holding that M.C. Code § 11A-5C (d) (2) is invalid.

However, in my view, M.C. Code § 11A-5C (d) (2) is severable from the remaining valid portions of § 11A-5C. In determining whether the valid portions of a statute or statutory scheme are severable from the invalid portions, courts look to the intent of the Legislature. The test of severability is whether a legislative body at the time of enactment would have intended that the valid portions be effective if it had known that the invalid portions could not be carried out. Under the principles of severability, there is a presumption, even in the absence of an express clause or declaration, that a legislative body generally intends its enactments to be severed, if possible. Moreover, the presence of a severability clause in an enactment, while not conclusive, reinforces the presumption of severability. Finally, when the dominant purpose of an enactment may largely be achieved by the enforcement of the remaining valid portions of the Act, courts will generally hold the valid portions of the Act severable and enforce them. *O. C. Taxpayers for Equal Rights, Inc. v. Mayor of Ocean City,* 280 Md. 585, 600-01, 375 A.2d 541, 549-50 (1977); *Ulman v. State,* 137 Md. 642, 645, 113 A. 124, 126 (1921).

Here M.C. Code § 11A [the Act] contains a severability clause which reinforces the presumption of severability. M.C. Code § 11A-5C Sec. 2. (now § 11A-13 Sec. 2.). Moreover, the valid portions of the Act will be effective even though the invalid portions cannot be carried out.

The dominant purpose of the statutory scheme of the Act, embodied in § 11A-5C (d), is to protect tenants by requiring an owner to offer a right of first refusal before transfer to a purchaser who intends to convert to condominium. Even if § 11A-5C (d) (2) is invalidated, § 11A-5C (b) remains fully enforceable under § 11A-5C (g).

The purpose of M.C. Code § 11A-5C (d) is to provide similar protection to tenants under the limited circumstance in which an owner who previously had sworn that he had no intention to convert to condominium nonetheless converts to condominium. I recognize that the invalidation of M.C. Code § 11A-5C (d) (2) deprives tenants of the protection of the right of first refusal under this very limited circumstance. Nevertheless, tenants even under such circumstances remain protected to a large degree by the laws of perjury which serve as a deterrent to owners who might engage in such conduct. Thus, that portion of the statutory scheme embodied in § 11A-5 (d) (2) is of minor significance, and its invalidation does not prevent the valid portions of the Act from being effective.

Because the dominant purpose of M.C. Code § 11A-5C can be achieved by the enforcement of the valid portions of the Act, I am convinced that the Montgomery County Council would have enacted § 11A-5C even if it had know that M.C. Code § 11A-5C (d) (2) was invalid. Because I conclude that M.C. Code § 11A-5C (d) (2) is severable, I would hold the remaining portions of M.C. Code § 11A-5C to be valid.

## II

### Relocation Cost Reimbursement Provision

The relevant statutory sections here are Md. Code (1974, 1980 Cum. Supp.), § 11-120 of the Real Property Article and M.C. Code § 11A-5 (c) of the Condominium Chapter.

Maryland Code § 11-120 provides:

> "§ 11-120. *Zoning* and building regulations.
> (a) Except as otherwise provided in this title, the provisions of all laws, ordinances, and regulations

concerning *building or zoning* shall have full force and effect to the extent that they apply to property which is subjected to a condominium regime and shall be construed and applied with reference to the overall nature and use of the property without regard to the form of ownership. No law, ordinance, or regulation may establish any requirement or standard *governing the use, location, placement or construction of any land and improvements* which are submitted to the provisions of this title, unless the requirement or standard is uniformly applicable to all land and improvements of the same kind or character not submitted to the provisions of this title.

(b) No county, city, or other jurisdiction may enact any law, ordinance, or regulation which would impose a burden or restriction on a condominium that is not imposed on all other property of similar character not subjected to a condominium regime. Any such law, ordinance, or regulation, is void." (Emphasis added.)

Montgomery County Code § 11A-5 (c) (now § 11A-7 (c)) provides in pertinent part:

"(c) Upon the involuntary termination of any tenancy which results from a condominium conversion, the developer or converter shall *reimburse* displaced tenants, determined to be in need of financial assistance under criteria established by County Executive regulation, the *reasonable costs of relocation* as determined under regulations issued by the County Executive up to a maximum obligation of $750." (Emphasis added.)

I do not agree with the majority that Md. Code § 11-120 (b) prohibits all local laws that impose a burden or restriction on a condominium that is not imposed on all other property of similar character. In my view, Md. Code § 11-120 prohibits a county from enacting only those local laws that do not apply building, land use and zoning

regulations such as land use standards, building code requirements, and similar standards and requirements uniformly to condominiums and other property substantially similar in character, regardless of the form of ownership.

The majority relies on a generalized statement in a single sentence in the introductory comments contained in the Committee report that proposed the enactment of the Horizontal Property Act which said:

> "The Committee cannot emphasize sufficiently the importance which it attributes to the General Assembly passing one statute that will govern condominiums in the entire State so that this important new phase of real estate development is not sectionalized on a county by county basis. See § 11-120."

I agree with the majority that in that sentence the Committee emphasized the importance of enacting a statute "that will govern condominiums in the entire State."

In my view, however, the majority has read this sentence out of context. In the remainder of the paragraph in which the sentence appears, the Committee said:

> "Some counties are using the popularity of the consumer's interest in condominiums to impose regulations that are different than the ones applicable to *apartment buildings.* There is no basis in reason or fact for such a distinction when it is remembered that a condominium is merely a different form of ownership of title to the same structure. For instance, the Committee does not believe a county should impose a more stringent fire rating on the walls of a building merely because the unit owners own an interest in the units. Tenants burn just as rapidly as owners and a respectable argument can be made that a tenant, who has a lesser property and financial interest in the structure, should be protected by higher minimum

requirements than an owner. If the fire rating is inadequate for a wall in a building that is inhabited, the building code should be amended to require an adequate rating for that building, without regard to the form of ownership of the occupied areas." (Emphasis added.)

Thus, the Committee's primary concern, as expressed in the full paragraph in which the sentence appears, was that apartment buildings, in which the units are rented by the residents, and condominium buildings, in which the units are owned by the residents, should not be subjected to nonuniform building, land use and zoning regulations under local law. The underlying rationale for this conclusion was that apartments and condominiums are essentially the same in their physical and use characteristics, although the form of ownership differs. Thus, from the introductory comments contained in the Committee report, I conclude that the Committee, and therefore the Legislature, intended to prohibit only local laws that regulate physical and use characteristics, such as land use standards, building code requirements, and similar standards and requirements, and that are not uniformly applicable to condominiums and apartments or other property substantially similar in character. I cannot conclude, as does the majority, that the Legislature intended to require uniformly applicable local laws regulating an owner's responsibility to tenants during a building's conversion from a rental facility to a condominium or some other form of ownership, such as a cooperative, or to some other use, such as a commercial or office building.

The Committee's comments specifically interpreting the express language of Md. Code § 11-120 also lead to the same conclusion. These comments state:

"The last sentence of subsection 11-120 (a) and subsection 11-120 (b) constrain the adoption of local laws, etc., which apply *different land use standards, building code requirements and the like* to condominiums than would be applied to other prop-

erty substantially similar in character not submitted to the provisions of this Title. The Committee firmly concluded that 'condominium' is a matter of title (i.e., a form of ownership) and not a matter of land use or zoning. These provisions are *substantially the same* as those adopted in several other jurisdictions (e.g., Chapter 711.21, Florida Statutes) . . . ." (Emphasis added.)

In the initial two sentences of this comment, the Committee could not have more clearly expressed the fact that the purpose of Md. Code § 11-120 was confined to prohibiting the adoption of only such local laws as would nonuniformly regulate the physical and use characteristics of condominiums and apartments or other property substantially similar in character. In attributing to the Legislature a purpose substantially broader than that so clearly expressed by the Committee, the majority relies not only on a generalized statement in a single sentence in the introductory comments of the Committee report that, in my view, is read out of context, but also on the fact that arguably, under my interpretation, "subsection (b) is rendered surplusage." The majority's analysis in this respect is unpersuasive because under its own convoluted interpretation of Md. Code § 11-120, the second sentence of subsection (a) is rendered surplusage.

Similarly, in the third sentence of the comment specifically interpreting the express language of Md. Code § 11-120, the Committee could not have more clearly expressed the fact that the purpose of Md. Code § 11-120 and that of the Florida statute were "substantially the same." The Florida statute contains no language similar to that contained in Md. Code § 11-120 (b). Thus, the Florida statute's purpose is unequivocally confined to prohibiting the adoption of only such local laws as would nonuniformly regulate the physical and use characteristics of condominiums and apartments or other property substantially similar in character. Because, in my view, the legislative purpose of Md. Code § 11-120 and that of the

Florida statute is the same, I cannot, as does the majority, interpret Md. Code § 11-120 (b) as establishing a purpose for Md. Code § 11-120 never envisaged by or embodied in the Florida statute.

In my view, Md. Code § 11-120 (a) and (b) can be successfully harmonized to achieve the legislative purpose. The first sentence of Md. Code § 11-120 (a) provides that all existing local laws concerning building or zoning are applicable to condominiums. The second sentence of that subsection provides that a county may not enact local laws regulating the physical and use characteristics of condominiums that are not uniformly applicable to other property substantially similar in character. Maryland Code § 11-120 (b) provides that if a county enacts any local law in violation of Md. Code § 11-120 (a), such an enactment is void. Thus, in my view, the Committee's plain and unambiguous comments specifically interpreting the express language of Md. Code § 11-120 (a) and (b) support the conclusion that the Legislature's purpose was to prohibit only such local laws as establish zoning, land use, building, and similar regulations that are not uniformly applicable to condominiums and apartments or other property substantially similar in character, and not to require uniformly applicable local laws regulating an owner's responsibility to tenants during the course of a building's conversion.

This conclusion is further supported by the caption of Md. Code § 11-120 that appears in Chapter 641 of the Acts of 1974, effective 1 July 1974, as, "Zoning." In Md. Code § 11-120, this caption appears as, "Zoning and building regulations." While captions of sections in the Annotated Code of Maryland, inserted by the codifier, may not be considered in interpreting statutes, Md. Code (1957, 1976 Repl. Vol.), Art. 1, § 18, captions of sections adopted by the General Assembly when it enacts a statute may be considered. State Farm Mutual Auto. Ins. Co. v. Insurance Comm'r of Md., 283 Md. 663, 674-75 & n.3, 392 A.2d 1114, 1120 & n.3 (1978). The caption, "Zoning," was adopted by the General Assembly when it enacted Chapter 641 and may,

therefore, be considered. Manifestly, the use of this caption indicates that the Legislature intended the prohibition of Md. Code § 11-120 to apply only to local laws that regulate the physical and use characteristics of condominiums and that are not uniformly applicable to apartments or other property substantially similar in character, and not to local laws regulating an owner's responsibility to tenants during the course of a building's conversion. Thus, the introductory comments in the Committee report, the Committee's comments specifically interpreting the express language of Md. Code § 11-120, and the caption of Md. Code § 11-120 all lead to the same conclusion.

Montgomery County Code § 11A-5 (c) requires that under certain circumstances an owner reimburse for reasonable costs of relocation upon the involuntary termination of a tenancy that results from a condominium conversion. This subsection is part of a provision that delineates an owner's responsibilities to tenants during the course of a conversion from a rental facility to condominium. Montgomery County Code § 11A-5 (c) is not a local law that nonuniformly regulates the physical and use characteristics of condominiums and apartments or other property substantially similar in character. Therefore, M.C. Code § 11A-5 (c) is not prohibited by Md. Code § 11-120 and is not void. Accordingly, I would hold M.C. Code § 11A-5 (c) to be valid.

Judge Cole authorizes me to state that he joins me in the views expressed herein.